**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-645-DLF** |
| **KEVIN DOUGLAS CREEK,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Kevin Creek to twenty-seven months' incarceration, the mid-point of the Guidelines range agreed to by the parties in the plea agreement, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment.

## I.        INTRODUCTION

The defendant, Kevin Creek, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.7 million dollars' worth of losses.[1]

---

[1]      As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

1

Creek, a business owner and former United States Marine, joined the crowd of rioters facing off with police officers on the West Front of the Capitol on January 6.   After the crowd pushed through the barriers, Creek took advantage of the chaos to attack two police officers as they attempted to retreat after their defensive line had crumbled.   Creek has yet to show meaningful remorse for his actions.   The government recommends that the Court sentence Creek to 27 months' incarceration, the middle of the advisory Guidelines' range of 24-30 months.   The parties stipulated that was the correct range in the plea agreement.   A sentence of 27 months' incarceration reflects the gravity of Creek's conduct and acknowledges his early admission of guilt.

## II.   FACTUAL BACKGROUND

### A.   The January 6, 2021, Attack on the Capitol

On January 6, 2021, thousands of rioters unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.   Many rioters attacked and injured police officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property.   Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed to the violence and destruction that day.   *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

2

As set forth in the PSR and the Statement of Offense incorporated into Creek's plea agreement, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol. Members of the House of Representatives and the Senate were meeting to certify the vote count of the Electoral College of the November 3, 2020, Presidential election.   By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside.   At approximately 2:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building. Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.   Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting police officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. All proceedings, including the joint session, were effectively suspended.   The proceedings

resumed at approximately 8:00 p.m. after the building had been secured.   Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.   (*See* Statement of Offense ¶¶ 1-7; PSR ¶¶ 13-19.)

### *Attempted Breach of the Capitol Building and Assaultive Conduct on the West Front of the Capitol Grounds*

Assaults against law enforcement on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6, 2021, possible.   Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the United States Capitol Police's ("USCP") defenses until the building itself was accessible and the occupants were at risk. The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



*Exhibit 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling throughout the grounds.   At approximately 12:45 pm, a crowd began to gather against the barricades near the Peace Monument, which led to the Pennsylvania Walkway.   Seeing this, a half dozen USCP officers began to gather behind what is labeled in Government's Exhibit 1 as "1st Police Barricade," circled in red and marked as Area A.   At 12:52 pm, the first breach of the outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to

engage with USCP officers at the first manned barrier.   Less than a minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob.   By 12:58, the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Government's Exhibit 1.   They flooded the area labeled "Lower West Plaza," Area C on Government's Exhibit 1, pushing against the barricade there.



*Exhibit 2: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza.   For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles,

pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.



*Exhibit 3: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left).   In the photo of the nearly completed bicycle rack barrier line as of 1:39 pm, a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 pm, the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol.   At 2:03 pm, Metropolitan Police Department officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd.   It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b). All people must leave the area immediately.   This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left.   On the contrary, the mob in the restricted area continued to grow as crowds

streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles.   Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves.   By 2:28 pm, with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called.   With their defensive lines extinguished, several police officers were surrounded by the crowd.   The rioters had seized control of the West Plaza and the inauguration stage.   There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 pm to build to a torrent.



*Exhibit 4: Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

### *Injuries and Property Damage Caused by the January 6, 2021, Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021).   Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself."   *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021); *see also United States v. Fox*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish.   This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system."); *United States v. Chrestman*, No. 21-mj-218, 2021 WL 765662, at *7 (D.D.C. Feb. 26, 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.").

In addition, the rioters injured more than a hundred police officers.   *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with police. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on police officers and others on scene that day who feared for their safety.   *See id*; *see also* Architect of the Capitol, J. Brett

Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the Capitol Building.  They caused extensive, and in some instances, incalculable, losses.  This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways.  *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues).  The attack resulted in substantial damage to the Capitol, resulting in losses of more than 2.7 million dollars.

### B.       Defendant's Role in the January 6, 2021, Attack on the Capitol

Kevin Creek, a former United States Marine and roofing business owner, participated in the January 6 attack on the Capitol.  His crimes are documented on body worn cameras used by officers of the Metropolitan Police Department, United States Capitol Police surveillance footage, and in publicly available videos taken by members of the media and the crowd surrounding him.

On January 5, 2021, Creek traveled by automobile with three associates from Georgia to Washington, D.C. to participate in the "Stop the Steal" rally in support of former President Donald

Trump.   On January 6, Creek packed a backpack with supplies including a first aid kit, mace, a

boot knife, and binoculars.   Creek and his three associates all had radios in case the "phones went

down."   Creek claimed that he was carrying the mace and the boot knife in case of an attack by

members of Antifa.   Creek was wearing a camo-colored baseball hat bearing the logo of the

United States Marine Corps.   (*See* Exhibit 5.)



*Exhibit 5: Creek in the Crowd on January 6, 2021*

On the morning of January 6, Creek joined a large group of people gathered near the

Washington Monument to hear former President Trump's speech.[2]   Creek then headed towards

the Capitol with two of his associates.   The scene when they arrived on the west side of the Capitol

building was chaotic and volatile.   Creek's two associates made the decision to stay back.   But

Creek wanted to be at the front of the crowd.

Creek described what he saw on the West Front of the Capitol as "incredible."   There was

---

[2]      Characterizations of the scene on the West Front and descriptions of events on January 6
in this and the following paragraph come from statements by Creek in his voluntary interview with
law enforcement prior to his arrest.

tear gas and chemical irritant in the air all around him.   Creek described the crowd as thick, and everyone around him was yelling.   Creek saw a woman with what looked like a broken arm.   He stated that he gave her ibuprofen from his first aid kit.   Creek saw police officers with "cannister looking guns" at the top of the steps to of the Capitol.   Yet, he and other members of the crowd wanted to get there.   Creek saw one rioter with a gun tucked into his waistband.



*Exhibit 6: Creek in the crowd on the West Plaza, circled in yellow*

Just before 2:30 p.m., Creek and the mob pushed up against the bike-rack barrier backed by a thin line of police officers.   The barrier had been reconstituted by police after the first breach of the West Front that occurred over an hour earlier.   The mob, including Creek, pushed through the reconstituted barrier, breaking the line of bike-rack fencing and the police officers behind it. Creek ran through the front of the crowd, grabbing a Metropolitan Police Department (MPD) Officer (hereinafter referred to as "Officer J.C.M.") and driving him backward forcefully several

feet through the West Plaza.   After letting go of Officer J.C.M., Creek hit him in the face shield

of his helmet.   Creek then pointed aggressively to his Marine Corps cap, as if to emphasize, "I'm

a Marine!"   Officer J.C.M.'s body-worn camera captured the moment he first encountered Creek:



*Exhibit 7: Creek grabs Officer J.C.M.'s baton as he prepares to drive the officer backwards*

Screenshots of this interaction from a publicly available video, Exhibit 8,[3] are below:



*Exhibit 8.1: Creek driving Officer J.C.M. backward through the West Plaza*



*Exhibit 8.2:   Enlargement and Still of Exhibit 8 at time stamp 0:46 of Creek striking Officer J.C.M. in the face shield*

---

[3]        *See* https://www.youtube.com/watch?v=VmJRqUYjlY4&t=41s.

This same assault was also captured on another public video, Exhibit 9.[4]   Exhibit 9.1, below, is a screen capture of that video:



*Exhibit 9.1:   Creek hitting Officer J.C.M. in the face shield*

Creek then made a beeline for a U.S. Capitol Police (USCP) officer (hereinafter referred to as "Officer R.S.E.") who was attempting to protect himself behind a bike rack barrier and a police shield.   Creek went around the bike rack barrier, gave Officer R.S.E. a hard shove in the shoulders, and then kicked him, causing Officer R.S.E. to fall backward to the ground.   Officer R.S.E. tried to get up when another rioter pushed him back down to the ground.

---

[4]    This video appears to have been originally posted to the social media site Parler on January 6, 2021, by Savanah Hernandez, who describes herself as a reporter and political commentator. *See https://www.savsaysofficial.com/about.*   This video has since been deleted from Parler, but it remains             archived             publicly             online.             *See* https://web.archive.org/web/submit?url=https://video.parler.com/xM/8C/xM8CXfu9pQHk.mp4.   The government has provided the Court and defense counsel with a copy of this video.



*Exhibit 9.2: Creek shoving Officer R.S.E. on the other side of a bike rack*



*Exhibit 10:   Creek kicking Officer R.S.E*

After backing away from Officer R.S.E., Creek picked up what looks like a ratchet strap—a thick

strap with heavy metal buckles—from the ground and threw it in the direction of officers.



*Exhibit 8.3: Enlargement and still of Exhibit 8 at time stamp 1:07 of Creek (yellow) throwing the item (red) at officers*

**Defendant's Statements**

A few days after returning to Georgia after the riot, Creek reported to the emergency department at Northside Hospital Forsyth.   Creek told an emergency room doctor that he had been feeling unwell for a few days and that his body had been "acting up since the gas."   Creek told

the doctor that he had gone to Washington, D.C. and participated in the attack on the Capitol on January 6.   Creek claimed that he tried to get inside the Capitol building but that he "went to the wrong door."   The door that Creek approached was guarded by police officers who, according to Creek, were "gassing" people trying to get through the door.   Creek saw rioters entering the Capitol through a different door.   Creek told the doctor that he had been gassed previously as part of his military training.   The doctor reported that his encounter with Creek was strange because Creek was not ashamed about participating in the events of January 6 and was speaking "very normally" about the events and his participation in them.

Creek participated in a voluntary interview with FBI agents prior to his arrest.   Creek reported carrying a boot knife on January 6, and said that he chose not to bring a gun because he knew that guns were illegal in D.C.   Creek was shown videos of his assaults on the two police officers.   Creek confirmed that it was him in the videos but claimed he did not remember assaulting any officers.   Creek suggested that one of his associates, with whom he had a falling out on the way back to Georgia, was trying to get him in trouble by telling law enforcement officials that Creek assaulted police.   When asked whether he regretted his conduct, Creek replied, "50/50."   Creek stated that he regretted having to talk to FBI agents and never imagined that he'd be in trouble with the FBI.   He also complained about having to go through "the whole nine yards" during airport screening.   Creek said that he "lost his country" on January 6.

## III.   THE CHARGES AND PLEA AGREEMENT

On June 4, 2021, a complaint issued in the District of Columbia charging Creek with Civil Disorder in violation of 18 U.S.C. § 231(a)(3), Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1), Entering or Remaining in any Restricted Building or Grounds

in violation of 18 U.S.C. § 1752(a)(1), Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2), Engaging in Physical Violence in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(4), Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D), and Acts of Physical Violence in the Capitol Grounds or Buildings in violation of 40 U.S.C. § 5104(e)(2)(F).

On December 1, 2021, Creek pleaded guilty to a single-count information charging him with a violation of 18 U.S.C. § 111(a)(1).

## IV.    STATUTORY PENALTIES

Creek now faces sentencing for assaulting two police officers on January 6, in violation of 18 U.S.C. § 111(a)(1).

As noted by the plea agreement and the U.S. Probation Office, Creek faces up to 8 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Count Three, Assaulting, Resisting, or Impeding Certain Officers.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).  "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.  The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing.  *Id.* at 49.

Here, as stipulated by the parties, the Guidelines calculations for Creek's assault on the two officers is as follows:

| | |
|---|---|
| Base Offense Level: | 14 (U.S.S.G. § 2A2.2(a)) |
| Specific Offense Enhancement for official victim: | +6 (U.S.S.G. § 3A1.2(b)) |
| Acceptance of Responsibility | -3 (U.S.S.G. § 3E1.1) |
| Total | 17 |

The PSR's guidelines calculation for Count One differs from the Guidelines calculation agreed to by the parties in the plea agreement.   The PSR erroneously applies U.S.S.G. §2A2.4, rather than §2A2.2, to determine the offense level for Count One.   The parties submit that U.S.S.G. §2A2.2 is the correct guideline for calculating the Creek's offense level for this count.

Creek entered a guilty plea to an information charging him in Count One with violating 18 U.S.C. § 111(a)(1) for assaulting, resisting, or impeding certain officers or employees.   Because that assault qualifies as an "Aggravated Assault" under U.S.S.G. §2A2.4(c), the appropriate guideline is §2A2.2, rather than §2A2.4. Section 2A2.4(c) is a cross-reference to §2A2.2, which applies "[i]f the conduct constituted aggravated assault."   In that phrase, "conduct" refers to all relevant conduct for the offense, not simply the assault for which Creek was convicted.   *See United States v. Valdez-Torres*, 108 F.3d 385, 387–88 (D.C. Cir. 1997).   Section 2A2.2, in turn, defines "aggravated assault" as a "felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another felony."   U.S.S.G. §2A2.2 cmt. n.1.

The cross-reference in §2A2.4(c) applies here because the assault charged in the information constituted an aggravated assault. The Guidelines do not define "assault" or "felonious assault," and sentencing courts have looked to the common law to define "assault" for Guidelines purposes. *See United States v. Hampton*, 628 F.3d 654, 660 (4th Cir. 2010). Assault encompasses conduct intended to injure another or presenting a realistic threat of violence to another. *See United States v. Dat Quoc Do*, 994 F.3d 1096, 1099 (9th Cir. 2021) (federal common-law assault includes (1) "a willful attempt to inflict injury upon the person of another," or (2) "a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm.") (citations omitted); *Lucas v. United States*, 443 F. Supp. 539, 543-44 (D.D.C. 1977) (individual assaulted police officer, in violation of 18 U.S.C. § 111, where he "forcibly grabbed" the officer; § 111 "includes the lifting of a menacing hand toward the officer, or shoving him"), *aff'd*, 590 F.2d 356 (D.C. Cir. 1979). Here, Creek assaulted a Metropolitan Police Officer by driving that officer backward, striking the officer's left hand as the officer held a baton, and hitting the officer in the face shield. Creek assaulted a U.S. Capitol Police Officer by pushing and kicking that officer, causing the officer to fall backward. That conduct reflected a "willful attempt to inflict injury upon" the officers.

The assault charged in the information is a "felonious assault" under 18 U.S.C. § 111 for two reasons. First, it involved physical contact. *See* 18 U.S.C. § 111(a) (mandating imprisonment of up to eight years where assault involves physical contact with the victim of that assault). Second, it involved "an intent to commit another felony" because the assault occurred during the commission of another felony offense, namely, 18 U.S.C. § 231(a)(3) (Obstructing,

22

Impeding, or Interfering with a Law Enforcement Officer During a Civil Disorder).   *See* 18 U.S.C. § 111(a) (mandating imprisonment of up to eight years where the assault involves the intent to commit another felony).   Here, the defendant obstructed and interfered with law enforcement officers by punching and kicking those officers in the midst of an ongoing civil disorder.

The "felonious assault" here qualified as an "aggravated assault" as defined in U.S.S.G. §2A2.2 cmt. n.1.   As noted above, an aggravated assault in the Guidelines is a "felonious assault" that involved . . . an intent to commit another felony."   *Id.*   Here, the felonious assault in 18 U.S.C. § 111(a) involved the intent to commit the civil disorder felony violation (18 U.S.C. § 231(a)(3)), as described in the preceding paragraph.   Moreover, because Section 231(a) is a specific-intent crime, *see United States v. McHugh*, No. 21-cr-453, 2022 WL 296304, at *14 (D.D.C. Feb. 1, 2022), the intent-to-commit-another-felony basis for finding an aggravated assault exists even under a more restrictive approach that would apply the aggravated-assault definition in U.S.S.G. §2A2.2's commentary only "if a defendant commits another felony that has a specific intent mens rea or if the defendant specifically intended to committee the other felony—*i.e.*, the purposes of the assault was to commit another felony," *United States v. Rodella*, No. 14-cr-2783, 2015 WL 711941, at *31 (D.N.M. Feb. 5, 2015).   It is not required that the defendant be charged with or convicted of a violation Section 231(a)(3).[5]  *See United States v. Thompson*, 60 F.3d 514, 518 (8thCir. 1995) (upholding finding that defendant committed aggravated assault where defendant was convicted under Section 111 and his conduct involved the intent to commit state-law robbery, where the state-law robbery charge was later dismissed); *United States v. Rue*, 988

---

[5]      In fact, the criminal complaint that preceded the information to which the defendant pleaded guilty charged the defendant with a violation of 18 U.S.C. § 231(a)(3). (*See* Complaint, Dkt. 1).

F.2d 94, 97(10th Cir. 1993)(upholding finding that defendant committed aggravated assault where defendant was convicted under Section 111 and his conduct involved the intent to commit possession of a syringe and a controlled substance, where the defendant was charged with but not convicted of the latter offenses); *United States v. Robles*, 557 F. App'x 355, 359 (5th Cir. 2014) (upholding finding that defendant committed aggravated assault where defendant was convicted under Section 111 and his conduct involved the intent to commit the uncharged state-law felony of evading arrest while using a vehicle); *United States v. Ranaldson*, 386 F. App'x 419, 429 (4th Cir. 2010) (upholding finding that defendant committed aggravated assault where defendant was convicted under Section 111 and his conduct involved the intent to commit the uncharged state-law felony of intentionally attempting to disarm a law enforcement officer).   Other judges on this Court have applied the cross-reference in §2A2.4(c) in analogous circumstances.  *See United States v. Leffingwell*, 21-cr-5 (ABJ), ECF No. 53 at 12-24.[6]

The U.S. Probation Office calculated Creek's criminal history as category I, which is not disputed.  (PSR ¶ 41.)   Accordingly, based on the parties' calculation of Creek's total adjusted offense level, after acceptance of responsibility, at 17, Creek's Guidelines range is 24 to 30 months' imprisonment.   Creek's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

---

[6]     This Court has also applied the §2A2.4(c) cross-reference in the following cases where application of the cross-reference was not disputed:   *United States v. Duke Wilson,* 21-cr-345 (RCL); *United States v. Devlyn Thompson*, 21-cr-461 (RCL); *United States v. Robert Palmer*, 21-cr-328 (TSC); *United States v. Languerand*, 21-cr-353 (JDB); *United States v. Fairlamb*, 21-cr-120 (RCL).

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6).   In this case, as described below, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in American history.   It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants.   By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each person who entered the Capitol and assaulted police on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed.   As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air.   Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with police.

While looking at Creek's individual conduct, this Court, in determining a fair and just sentence, should look to a spectrum of aggravating and mitigating factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, police; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition.   While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The nature and circumstances of Creek's crime weigh heavily towards a significant term of incarceration, as have been consistently imposed by judges of this Court in other January 6 cases involving police officer assaults.   Creek prepared for violence on January 6, and then engaged in violence.   He decided to press forward to the front of the line in the West Plaza despite the violence he was witnessing himself as well as the concerns of his friends, who decided to stay back.   Creek, along with hundreds of others, broke a police line, causing police officers to be pushed, trampled, and otherwise assaulted while preventing them from carrying out their duty to protect the Capitol.   These officers were in the midst of retreating and were surrounded by rioters, so they were particularly vulnerable at the moment they were attacked.   Creek exploited this vulnerability as he enthusiastically participated in two such assaults on police—he violently pushed and hit Officer J.C.M. in the face, shoved and kicked Officer R.S.E., knocking him to the

ground—and threw a ratchet strap at officers.   Creek's gesture towards his Marine Corps cap after assaulting Officer J.C.M. indicates Creek's intent to weaponize his military training and experience against police officers.   Creek also claimed that he was armed with a boot knife on Capitol grounds.[7]   As discussed above, the attack on law enforcement in the West Plaza was a pivotal point of the riot.   It was the zenith of the violence committed against police on January 6 and facilitated the interior breaches of the Capitol building.   Creek's individual conduct cannot be considered independent of the violent assault of the mob, of which he was inextricably a part.

As unconscionable as Creek's conduct was on January 6, his attitude towards his conduct in the aftermath is perhaps most troubling.   Although he nominally accepted responsibility for his assaults on Officers J.C.M. and R.S.E. as part of his plea agreement, Creek has shown no remorse for his actions on January 6.   In fact, in his statement to the PSR writer, he has *denied* conduct to which he pleaded guilty before this Court.   (*See* PSR ¶ 26.)   And, in his voluntary interview, Creek claimed that he could not remember assaulting any police officers even after he was shown videos of the assaults *and* confirmed that it was him in those videos.   His statement that he regrets his conduct "50/50,"—the 50 percent that he regrets apparently being limited to having to engage with FBI and face additional screening at the airport—demonstrates no regard for the officers that he assaulted or the danger that he posed to the country on January 6.

Creek's actions on January 6 show an appalling disregard for the rule of law coupled with a willingness to incite and engage in violence.   Creek's lack of remorse following the attack on the Capitol demonstrates a genuine danger of future violence from this defendant.

---

[7]     The government has no evidence that Creek removed the boot knife from his backpack while on Capitol grounds.   The government recovered the boot knife, which Creek identified, during a search warrant of his residence.

### B.        Creek's History and Characteristics

Creek lacks any scorable criminal history.   (*See* PSR ¶ 41.)   Creek is a business owner and appears to be financially stable.

Under different circumstances, Creek's military service would also militate in favor of a lighter sentence, but in this case, Creek's status as a Marine Corps veteran and the fact that he appeared to invoke that status immediately after assaulting one police officer and before moving on to assault another makes this aspect of his history and characteristics more aggravating than mitigating.

Creek's history and characteristics support the government's recommendation of a sentence in the middle of the applicable Guidelines range.

### C.        The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[8]   As with the nature and circumstances of the offense, this factor supports a sentence of incarceration.   Creek's criminal conduct—assaulting police officers—is the epitome of disrespect for the law.   When Creek entered the Capitol grounds, it was abundantly clear to him that police officers were overwhelmed, outnumbered and in serious danger.   The rule of law was not only disrespected; it was under attack that day.   A lesser

---

[8]        Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available                                                                                                            at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

sentence would suggest to the public, in general, and other rioters, specifically, that assaults on police officers are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

D.       **The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. ' 3553(a)(2)(B).   The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[9]   The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.   The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power.   As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

---

[9]       *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

Tr. at 69-70.   Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy.   It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation."   *Id.* at 70.

The gravity of these offenses demands deterrence.   This was not a protest.   *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.").   And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences.   There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a meaningful term of incarceration.   Creek's behavior on January 6 was deliberate and enthusiastic.   Yet he claimed he couldn't remember separately attacking two police officers by shoving, hitting, and kicking them, even after admitting he is in videos assaulting those officers.   Creek's denial of these assaults is either completely disingenuous or, if reflective of his true recollection, portends a total inability to prevent himself from committing the same kind of violence again.   It bears particular emphasis that Creek denied assaulting officers to the PSR writer.   As noted by the PSR, Creek's statement completely contradicts conduct he pleaded guilty to and admitted as part of the Statement of Offense.   (PSR ¶ 26.)   Creek's complete lack of contrition, outside of his guilty plea, demonstrates that this defendant's sentence must be significant to provide specific deterrence from committing future crimes of violence.

30

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007).   As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'"   *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards."   *Kimbrough*, 552 U.S. at 108.   Accordingly, courts must give "respectful consideration to the Guidelines."   *Id.* at 101.   As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005).   "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that Asignificantly increases the likelihood that the sentence is a reasonable one."   *Rita*, 551 U.S. at 347 (emphasis in original).   In other words, "the Commission's

recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'"   *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553(a) factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark.   As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis.   In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.   Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that Creek and others like him committed on January 6 are unprecedented. Mechanical comparison to many Section 111(a)(1) cases in other non-January 6 contexts would be a disservice to the magnitude of what the riot entailed and signified.   January 6 police officer assault cases that have already proceeded to sentencing provide helpful reference points.[10]

As of the date of this sentencing memorandum, six felony Capitol riot defendants have been sentenced for violations of Section 111(a)(1).   Four of those were also sentenced for violations of Section 111(b), the enhanced version of the assault on a federal officer statute.   In *United States v. Scott Fairlamb*, 21-cr-120 (RCL), the defendant, a former amateur Mixed Martial Arts fighter, entered the Senate Wing armed with a police baton and later punched a police officer

---

[10]     Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.   That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

in the face shield on the Upper West Terrace, similar conduct to Creek. Fairlamb also pled guilty to violating 18 U.S.C. § 1512(c) for obstructing the official proceedings taking place in the Capitol. In that case, the government recommended a 44-month sentence, which was the midpoint for his Guidelines range, and the Court sentenced Fairlamb to 41 months' imprisonment, the bottom of his Guidelines range.

In *United States v. Robert Palmer*, 21-cr-328 (TSC), the defendant repeatedly assaulted police with a wooden plank and then sprayed officers with a fire extinguisher, which he later threw at them, while on the Lower West Terrace of the Capitol. Palmer's conduct after January 6 disqualified him from the reduction for acceptance of responsibility under U.S.S.G. § 3E1.1. In that case, the government requested a sentence of 63 months' imprisonment, at the bottom of the Guidelines for that defendant, which the Court imposed.

In *United States v. Devlyn Thompson*, 21-cr-461 (RCL), the defendant assaulted an officer with a police baton while on the Lower West Terrace, threw a large box speaker at a line of police officers, and stayed in the area of some of the most vicious assaults for multiple hours.  The government requested a sentence of 48 months' imprisonment, near the bottom of the defendant's Guideline range while acknowledging the extraordinary fact that he identified himself to law enforcement and affirmatively reached out and arranged to plead guilty before ever being arrested or charged.  The Court imposed a sentence of 46 months' imprisonment, at the bottom of the Guidelines.

In *United States v. Nicholas Languerand*, 21-cr-353 (JDB), the defendant observed violence at the Capitol for two hours before joining in with other rioters to assault police officers on the Lower West Terrace. Languerand threw sticks and a traffic bollard at police officers and

eventually used a riot shield against the officers.   The government requested a sentence of 51 months, at the midpoint of the defendant's guideline range.   The Court imposed a sentenced of 44 months' imprisonment, two months below the bottom the Guidelines, noting the defendant's acknowledgement that his violent conduct on January 6 was wrong and his unusually difficult childhood marked by, among several notable traumas, his father's imprisonment for setting the trailer Languerand lived in with his mother on fire.

In *United States v. Leffingwell*, 21-cr-00005 (ABJ), the defendant, like Creek, was convicted of a single count of violating 18 U.S.C. § 111(a).   Leffingwell ignored multiple officer commands to back up and away from the Senate Wing Door as they attempted to finally clear the Capitol building.   The crowd behind Leffingwell complied and several rioters also began calling for the crowd outside the doors to back up.   Leffingwell stood his ground, shouting "If you back up, you'll never get back in!"   He then punched two officers in the face.   Notably—and in stark contrast with Creek—at the much later hour Leffingwell committed his assault, law enforcement had mostly cleared the building, outnumbered the few remaining individuals who remained in the doorway, most of whom were retreating.   Moreover, Leffingwell suffered from a traumatic brain injury that he sustained while deployed overseas with the United States military and that resulted in him receiving full disability benefits.   The Court imposed a sentence of 6 months' imprisonment, well below the bottom the Guidelines, noting the defendant's sincere and almost immediate contrition, as he apologized to his victims the same day as his crime, while he was in custody post-arrest.   Creek, by contrast, has been a study in non-contrition.   In the landscape of January 6 cases involving officer assaults, Leffingwell is a distinct outlier.

Most recently, in *United States v. Duke Wilson*, 21-cr-345 (RCL), defendant Wilson

prevented police officers from shutting doors in the Lower West Terrace tunnel, allowing other rioters to pry the doors open and continue assaulting police officers.   The Lower West Terrace tunnel was the site of some of the most violent assaults on law enforcement on January 6, including the prominent assaults of MPD Officers Michael Fanone and Daniel Hodges.   After blocking the closure of the door, Wilson picked up what looked like PVC pipe and began striking officers.   Wilson attacked at least three officers in the Lower West Terrace tunnel with the pipe and his hands.   Wilson pleaded guilty to violations of 18 U.S.C. §§ 111(a) and 1512(c)(2).   Wilson's Guidelines range was 41 to 51 months' incarceration.   Judge Lamberth sentenced Wilson to 51months incarceration, the top of the range.

Because Creek was not armed when he assaulted police officers and did not inflict serious bodily injury,[11] he is not being prosecuted under 18 U.S.C. § 111(b), and his Guidelines range is lower than felony defendants other than Leffingwell.   But Creek did in fact violently assault two police officers and then throw an item at the retreating officers.   A sentence of 27 months' imprisonment—in the middle of the 24-30 month Guidelines range—would not create an unwarranted sentencing disparity between Creek's case and any other similar case.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[12]   *United States v. Papagno*, 639

---

[11]     For the purposes of Creek's plea to 18 U.S.C. § 111(a)(1), the government did not rely on Creek's statement that he was armed with a boot knife while on Capitol grounds.

[12]     The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a

F.3d 1093, 1096 (D.C. Cir. 2011).   Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b).   At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3).   *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here.   The two victims in this case did not suffer serious bodily injury as a result of Creek's assault.   The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Creek must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Creek played in the riot on January 6.[13]   (Plea Agreement at ¶ 12.)   Creek's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol.   (*See* PSR ¶ 115.)

---

subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

[13]   Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of twenty-seven months, which is a mid-range sentence as agreed upon by the parties in the plea agreement, restitution of $2,000, and the mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:     /s/
Kathryn E. Fifield
Trial Attorney
U.S. Department of Justice, Criminal Division
Detailed to the D.C. U.S. Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530
Kathryn.fifield@usdoj.gov
(202) 320-0048