```
 1                    BEFORE THE UNITED STATES DISTRICT COURT
                          FOR THE DISTRICT OF COLUMBIA
 2

 3    UNITED STATES OF AMERICA,          .
                                         .  Case Number 21-cr-645
 4            Plaintiff,                  .
                                         .
 5        vs.                            .
                                         .
 6    KEVIN DOUGLAS CREEK,               .  May 2, 2022
                                         .  10:07 a.m.
 7            Defendant.                  .
      - - - - - - - - - - - - - - - - -

 8

 9                    TRANSCRIPT OF SENTENCING HEARING
                  BEFORE THE HONORABLE DABNEY L. FRIEDRICH
10                    UNITED STATES DISTRICT JUDGE

11

12    APPEARANCES:

13    For the United States:       KATHRYN FIFIELD, AUSA
                                   SONIA MITTAL, AUSA
14                                 United States Attorney's Office
                                   601 D Street Northwest
15                                 Washington, D.C. 20579

16    For the Defendant:           TROY JONES, ESQ.
                                   Law Office of Troy B. Jones
17                                 418 South Gay Street
                                   Suite 204
18                                 Knoxville, Tennessee 37902

19

20    Official Court Reporter:     SARA A. WICK, RPR, CRR
                                   United States District Court
21                                     for the District of Columbia
                                   333 Constitution Avenue Northwest
22                                 Room 4704-B
                                   Washington, D.C. 20001
23                                 202-354-3284

24
      Proceedings recorded by stenotype shorthand.
25    Transcript produced by computer-aided transcription.
```

                          P R O C E E D I N G S

 1       (All participants present via video conference.)

 2           COURTROOM DEPUTY:  Your Honor, we are in Criminal

 3   Action 21-645, United States of America versus Kevin Creek.

 4       If I can have the parties identify themselves for the

 5   record, beginning with the United States.

 6           MS. FIFIELD:  Good morning, Your Honor.  Kathryn

 7   Fifield on behalf of the United States.  Sonia Mittal is also

 8   here to address any questions the Court has on the sentencing

 9   guidelines.

10       And with the Court's permission, we have two case agents

11   present from the FBI.  They're identified on the Zoom video as

12   Special Agent Vince Frederic, or V. Frederic -- I think he had a

13   little bit of trouble with his link -- and Special Agent Noel

14   Berthon.  They will keep their cameras off and microphones muted

15   throughout the proceeding.

16           THE COURT:  Okay.  If Case Agent Frederic can mute his

17   line.

18           COURTROOM DEPUTY:  Agent Frederic's line is muted,

19   Your Honor.

20           THE COURT:  It is?  Okay.  So who again are the

21   agents?  I'm sorry.

22           MS. FIFIELD:  The agents are Vince Frederic, V.

23   Frederic in the Zoom gallery, and Noel Berthon, N. Berthon in

24   the gallery.

1          THE COURT:  All right.  Thank you.

2       All right.  Mr. Jones?  We can't hear you.

3       Mr. Jones, this happens to me occasionally.  You might want

4    to drop off and rejoin.

5          (Pause.)

6          THE COURT:  All right.  So we have Mr. Jones and

7    Mr. Creek on the line.

8       Before we proceed, Mr. Jones, I do need to make a finding

9    under the CARES Act that it is appropriate to proceed by way of

10   video conference.  So I have to make a finding that this

11   sentencing can't be further delayed without a serious harm to the

12   interests of justice.

13      So can you explain for me why it's important that we proceed

14   now by way of video rather than wait until Mr. Creek can appear

15   in the courtroom in person?  We can't hear you.

16          MR. JONES:  Can you hear me?

17          THE COURT:  Barely.  I'm wondering, Mr. Jones, whether

18   it makes sense for you to mute your computer and call in on a

19   telephone line and put us on speaker.

20          MR. JONES:  Can you hear me now, Your Honor?

21          THE COURT:  We can, but you need to mute your

22   computer.

23          MR. JONES:  Is that better?

24          THE COURT:  Yes.

25          MR. JONES:  Okay.

1          THE COURT:  All right.  Can you explain to me why we

2     should proceed now by video conference?

3          MR. JONES:  Yes, Your Honor.  Mr. Creek has been

4     waiting, and we're prepared to -- for the sentencing today.  And

5     Mr. Creek also has other pending matters, medical conditions,

6     that he is having scheduled for surgery.  So we would like to

7     have the Court's permission to proceed right now.

8          THE COURT:  All right.  In light of the pandemic as

9     well?

10         MR. JONES:  In light of the pandemic as well, yes,

11    ma'am.

12         THE COURT:  All right.  Mr. Creek, do you understand

13    that you have the right to appear before me in the courtroom for

14    sentencing?  But I understand from your attorney that you would

15    like to proceed by way of video today in light of the pandemic

16    and your interest in resolving this case sooner rather than

17    later.  Is that correct?

18         THE DEFENDANT:  Yes, Your Honor, it is.

19         THE COURT:  All right.  I do find it's appropriate to

20    proceed by video and that sentencing can't be further delayed

21    without serious harm to the interests of justice.  So with the

22    defendant's consent, I will conduct this hearing by video.

23      I've reviewed the final presentence report and

24    recommendation of the probation officer.  I've also read the

25    parties' sentencing memoranda, their supplemental filings and

exhibits, reviewed the government's video exhibits.

Am I missing anything else that I should have read and reviewed that I haven't mentioned?  Ms. Fifield?

MS. FIFIELD:  Your Honor, the government submitted a victim impact statement from one of the officer victims yesterday into the folder on USAfx that also contains the video exhibits.

And consistent with the Court's minute order filed last Friday, that folder also contains edited versions of video Exhibits 8 and 9, which are slowed down and include a red box indicator to highlight the defendant.

THE COURT:  All right.  I take it -- I have not seen those.  I wish you had filed the victim statement on ECF.  I would have read it, reviewed it.  But I can take a break at the conclusion and review the victim statement, which I would like to see.

In terms of the video, the new video that's been posted, I've not seen the slowed-down video.  Do you plan to play that today?

MS. FIFIELD:  Yes, Your Honor.

THE COURT:  Okay.  All right.  And of course, as always, I reviewed the government's exhibit reflecting all of the various sentences that have been imposed in similar cases.

Mr. Jones, is there anything I didn't mention?  And I did review the letters that were submitted that were easier to read.

1    I couldn't read all of the first fax that you submitted.  But is

2    there anything else that I should have read or reviewed that I

3    haven't mentioned?

4              MR. JONES:  No, Your Honor.

5              THE COURT:  Okay.  All right.  Mr. Jones, have you

6    reviewed the presentence report with Mr. Creek?

7              MR. JONES:  I have, Your Honor.

8              THE COURT:  All right.  Mr. Creek, have you read the

9    presentence report, and have you had adequate time to talk to

10   your attorneys about it?

11             THE DEFENDANT:  Yes, Your Honor, I have.

12             THE COURT:  And have you had a chance to correct any

13   errors in the report?

14             THE DEFENDANT:  Yes, Your Honor.

15             THE COURT:  All right.  There are several unresolved

16   objections in the report.  The government objects to the

17   guidelines calculations, which I will address in a minute.  The

18   defense objects to a couple of factual issues.  First, the

19   defense objects to the release date in June of 2021 when

20   Mr. Creek was arrested.

21     Mr. Jones, you've seen the probation officer's response.

22   Is it still your position that Mr. Creek was released from

23   custody later than is reflected in the presentence report?  I

24   think this is important to get accurate, because to the extent

25   he's sentenced to prison time, he should receive credit for the

1    time he served.

2              MR. JONES:  It is the defendant's recollection that on

3    June 25th he was released.

4              THE COURT:  All right.  Ms. Willett, I saw your

5    response.  I'm concerned.  How do we verify what date he was

6    actually released?

7              PROBATION OFFICER:  Yes, Your Honor.  That's the

8    information that we have.  We selected it from ECF.  It was

9    indicated in a note that he had been released from the custody

10   of Northern District of Georgia the day before the 24th.  So we

11   don't have any information to the contrary.

12             THE COURT:  And what is the record?  The record is a

13   notation by the magistrate judge?

14             PROBATION OFFICER:  Yes, Your Honor.

15             THE COURT:  All right.  Well, there's a possibility

16   that's erroneous.  Does Probation or Mr. Jones have any other

17   idea how we can confirm what date he was actually released

18   beyond the magistrate's notation?

19             MR. JONES:  Your Honor, Mr. Creek has indicated that

20   he was released on Thursday, the 24th.

21             THE COURT:  All right.  Again -- and that's the date

22   he appeared before the magistrate?

23             THE DEFENDANT:  It is the last time I appeared before

24   the magistrate when I was released.  It was on a Thursday.  It

25   was two days before my son's birthday.

1          MR. JONES:  The defendant's recollection is that it

2     was two days before his son's birthday, the 26th.

3          THE COURT:  All right.  Well, we need something more

4     than his recollection.

5        Ms. Willett, I have seen errors in these -- in this

6     paperwork before.  So is there a way to confirm through law

7     enforcement when he was actually released?

8          PROBATION OFFICER:  Your Honor, I will do my best to

9     follow up on that.  I can get in contact with Pretrial in the

10    Northern District of Georgia, and they may be able to direct me

11    to a better way to verify that further.

12         THE COURT:  All right.

13         MR. JONES:  Your Honor?

14         THE COURT:  Yes.

15         MR. JONES:  We're looking at the appearance bond, and

16    it's dated June 24, 2021, signed by Mr. Creek.  That may help

17    the Court.

18         THE COURT:  And that is what?  The appearance bond?

19         MR. JONES:  Yes, ma'am.

20         THE COURT:  All right.  Does the government or

21    Probation know of any reason why that bond would be dated -- I

22    guess it's possible it could be dated the day after he was

23    released.

24         MS. FIFIELD:  Your Honor, I'm not aware, but along

25    with Probation, I can try to get more information for the Court.

1          THE COURT:  Mr. Jones, I don't see a need to delay the

2   sentencing hearing in order to figure this out, but I do want

3   Ms. Willett to try to verify this date and make any necessary

4   corrections to reflect, perhaps, that Mr. Creek was released on

5   June 24th instead of June 21st of 2021.

6      Mr. Jones, do you have any objection to proceeding with

7   Probation to follow up on this factual issue?

8          MR. JONES:  No, Your Honor.

9          THE COURT:  You can bring it back to my attention if

10  you're not satisfied once she's done so.

11         MR. JONES:  Yes, Your Honor.

12         THE COURT:  All right.  In addition, in the

13  objections, the defense states that Mr. Creek only threatened an

14  assault versus actually committed an assault, but that assertion

15  is contradicted by the defense's -- well, the defendant's

16  admissions under oath at the time of his plea, as well as the

17  defense's most recent supplemental filing.

18     Mr. Jones, are you not persisting with that objection?

19         MR. JONES:  No, Your Honor.

20         THE COURT:  You are not?  Is that right, you are not?

21         MR. JONES:  I'm not; no, Your Honor, we're not.

22         THE COURT:  Okay.  All right.  So aside from the

23  guidelines issues, are there any unresolved objections or

24  factual inaccuracies in the PSR other than those that we've

25  discussed and the guidelines?  Ms. Fifield?

MS. FIFIELD:  Other than the guidelines issue, no, not from the government.

THE COURT:  All right.  Mr. Jones and Mr. Creek, any other objections or factual inaccuracies in the PSR?

MR. JONES:  No, Your Honor.

THE DEFENDANT:  No, Your Honor.

THE COURT:  All right.  With the one caveat related to the release date, I will accept the presentence report as my findings of fact pursuant to Rule 32 of the Federal Rules of Criminal Procedure.

Before considering the relevant statutory factors I must consider in deciding where to sentence Mr. Creek, I must first accurately calculate the sentencing guidelines.  And as I've noted, the government has objected to the Probation Office's calculations.

The PSR calculates the guidelines under Section 2A2.4.  I do agree with the government and the plea agreement that 2A2.2 is the relevant guideline.  Section 2A2.4's cross-reference to Section 2A2.2 applies here because the conduct that Mr. Creek is convicted of constituted an aggravated assault, which is defined as a felonious assault that involved an intent to commit another felony, in this case obstructing, impeding, or interfering with a law enforcement officer during a civil disorder in violation of Title 18 United States Code Section 231(a)(3).  Section 231 is a different felony than Section 111(a) and has distinct

1   elements.  So I think it is appropriate to apply the

2   cross-reference in these circumstances, and this is consistent

3   with the decisions of other judges on this court.  See, for

4   example, *U.S. v. Languerand*, 21-353, and *U.S. v. Leffingwell*,

5   21-5.

6        Mr. Jones, is there anything you would like to add to what

7   I've said here?

8        I know that you initially agreed with Probation but then

9   again in the supplemental filing suggested that you weren't

10  arguing for a different guideline here.  But do you disagree

11  with the application of 2A2.2?

12            MR. JONES:  No, Your Honor.

13            THE COURT:  All right.  Anything else the government

14  would like to add?

15            MS. MITTAL:  No, Your Honor.

16            THE COURT:  All right.  I will note that applying

17  2A2.2 rather than 2A2.4 or even 2A2.3 results in a substantially

18  higher guideline range in this case.  But I do think, looking at

19  not only the cases in this district but other case law cited in

20  the government's brief, I do believe it's appropriate to apply

21  2A2.2.  Even though there is some overlap, I don't think it's

22  double-counting those that the Commission did not intend.

23        I also made an inquiry about the application of the

24  official victim enhancement, and I also on this issue do agree

25  with the government that it is appropriate under 2A2.2 to apply

```
1     the six-level victim enhancement.

2          Anything either side would like to add on that?  Mr. Jones?

3              MR. JONES:  No, Your Honor, with respect to that.

4              THE COURT:  Anything else the government would like to

5     add on that issue?

6              MS. MITTAL:  Simply, Your Honor, the government

7     submits that the (distorted audio).

8              COURT REPORTER:  Ms. Mittal --

9              THE COURT:  You broke up.  If you could speak into the

10    microphone.

11             MS. MITTAL:  Simply that the government believes that

12    the official victim adjustment under 3A1.2 would apply under

13    both Section B and Section C.

14             THE COURT:  All right.  Thank you, Ms. Mittal.  You're

15    welcome to stay on this hearing, but I understood you were here

16    to answer guideline issues.  So I won't take offense if you

17    decide to drop off.

18        And by the way, if any of you all have issues hearing me --

19    occasionally, there are WiFi issues in this chambers.  So if I'm

20    trailing off, someone needs to raise their hands so I know that

21    I'm not coming across clearly.

22             So far, has everyone heard me clearly?

23             MR. JONES:  Yes, Your Honor.

24             THE COURT:  Okay.  All right.  I do have some factual

25    questions relating to the offense.  Let me start with the
```

1    government.  I do want to see the slowed-down videos that you've

2    submitted to the Court.

3        But first, let me ask you, your sentencing memorandum

4    states that Mr. Creek threw a red strap, a red ratchet strap

5    with metal ratchets on it at officers who were defending the

6    Capitol, and I did see the screen shot of that.  I also saw the

7    video reflecting the red strap being thrown.  And you've

8    included a photograph of that in your brief -- your memo.

9        How do you know that the strap had the metal ratchets on

10   it?  Is this something that you recovered?

11           MS. FIFIELD:  No, Your Honor.  As it states in the

12   government's sentencing memorandum, we believe it to be a

13   ratchet strap from what we can see on the video, but we cannot

14   prove that it's a ratchet strap nor specifically that it's any

15   other item.

16           THE COURT:  You're speculating on that?

17           MS. FIFIELD:  I would say it's more than speculation.

18   I think you can tell from the way that he throws the object that

19   it's got some heft to it and the way that it arcs through the

20   air.  But no, we cannot determine specifically that it is a

21   ratchet strap.  The government is just saying it appears to be

22   something like a ratchet strap.

23           THE COURT:  Something like it.  Because another part

24   of your sentencing memorandum, and perhaps it's the PSR, it's

25   described as a strap with hooks.  That's different from a strap

1    with metal ratchets on it.

2         The government's position is it looks like a strap that has

3    something heavy on it; is that fair?

4              MS. FIFIELD:  That's fair, Your Honor.

5              THE COURT:  All right.  And that's why you haven't

6    charged Mr. Creek with a violation of 111(d), an assault with a

7    dangerous weapon, because you can't prove that?

8              MS. FIFIELD:  That's one reason, yes, Your Honor.

9              THE COURT:  What's the other reason?

10             MS. FIFIELD:  There is the issue of the defendant's

11   boot knife.  As stated in the government's sentencing

12   memorandum, we don't have any evidence that he removed this boot

13   knife, nor do we have any evidence, aside from his statement in

14   a voluntary interview, that he possessed a boot knife on Capitol

15   grounds, but that is there for the Court's information.

16             THE COURT:  Are you suggesting that a knife that was

17   on him, if I accept his statement at the time of his arrest as

18   true, somehow that would be assault with a deadly weapon, simply

19   by carrying the knife?

20             MS. FIFIELD:  No, Your Honor.  I misspoke.

21             THE COURT:  All right.  Was Mr. Creek asked about the

22   strap during his post-arrest interview with the FBI?

23        And by the way, I take it that that's an interview that

24   occurred in June of 2021, roughly six months after the events of

25   January 6?

1          MS. FIFIELD:  I do not believe he was asked about the

2     object that he threw at the officers, in the direction of the

3     officers.

4          THE COURT:  All right.  And that statement, again, it

5     was a post-arrest statement after he was arrested in June of

6     2021; is that correct?

7          MS. FIFIELD:  Your Honor, I would have to check the

8     exact date of the interview.  I believe it was before his

9     arrest.

10        Your Honor, the date that I have for the interview is

11    May 24, 2021.

12         THE COURT:  So before his arrest?

13         MS. FIFIELD:  Yes.

14         THE COURT:  And it was a voluntary interview?

15         MS. FIFIELD:  Yes.

16         THE COURT:  Can you tell me what the circumstances of

17    that interview were?

18         MS. FIFIELD:  Can you be any more specific, please,

19    Your Honor?

20         THE COURT:  Where did it occur?  How did it come

21    about?

22         MS. FIFIELD:  Your Honor, I don't have that

23    information handy, but I can follow up and get it for the Court

24    if the Court would like.

25         THE COURT:  All right.  Do you understand how that

interview took place?

I ask, because it's -- your description of it is odd in the sense that you state that Mr. Creek was shown -- if I'm reading your sentencing memorandum correctly, Mr. Creek was shown video footage of that date, of January 6, and he confirmed that he was reflected in that video footage. And yet, he also claimed he had no recollection of committing any assaults. It's hard to understand how the government elicited all those statements.

Did they first ask him about January 6 and then play the video and then he said he didn't remember the assaults? Do you have any particulars about the interview?

MS. FIFIELD: Your Honor, I understand from the FBI 302 and from conversations with the case agents that the case agent showed Mr. Creek photos and videos. I believe they were body-worn camera videos, and those were not submitted as exhibits to the Court. And I understand, again from the 302 and from -- we have two body-worn cameras of Creek assaulting two officers at the Capitol.

THE COURT: Can I stop you there. Why were the videos he was shown not submitted to the Court? Are they cumulative? Are they similar to what you submitted to the Court?

MS. FIFIELD: Your Honor, the aerial shots that the government submitted to the Court as exhibits are -- they show Mr. Creek and the assault more clearly than the body-worn camera does. I'm sure you've watched a lot of body-worn camera. It's

1    very shaky and jumbled.  It's hard to tell what Mr. Creek is

2    doing in those videos.  I have them, if the Court would like,

3    and I can submit them via USAfx.

4           THE COURT:  So that makes a little more sense.  So

5    Mr. Creek was shown body-worn camera footage that clearly showed

6    him but didn't necessarily show the assault; is that fair?

7           MS. FIFIELD:  It's fair that the first -- it did not

8    clearly show the video of the first assault.  But it's my

9    understanding that he was shown body-worn camera that clearly

10   showed the second assault where he kicked Officer R.S.E.

11          THE COURT:  And yet, he claimed he didn't remember

12   assaulting any officers on that day?

13          MS. FIFIELD:  That's my understanding from the 302 and

14   conversations with the case agent.

15          THE COURT:  All right.  And what evidence -- I saw the

16   photographs of the body-worn camera footage in the sentencing

17   memorandum, but tell me specifically what the evidence is that

18   you have that he pointed to the Marine Corps insignia on his

19   hat.

20          MS. FIFIELD:  You can see it pretty clearly in, I

21   think, both exhibits, because he very clearly in Exhibit 8,

22   which I will show the Court, and the slowed-down version -- you

23   can see it pretty clearly in both the regular-speed and the

24   slowed-down version of the video.

25          THE COURT:  All right.  Did Mr. Creek only give one

1   interview to the FBI?

2   　　　　　MS. FIFIELD:  That's my understanding, yes.

3   　　　　　THE COURT:  From my understanding -- and I haven't

4   looked back at his plea agreement.  But in most, if not all, of

5   the plea agreements I've had relating to January 6, a standard

6   condition of the plea agreement is that the defendant agrees to

7   be interviewed before sentencing about the events of the day.

8   　　　Does his plea agreement have that provision in it?

9   　　　　　MS. FIFIELD:  One moment, Your Honor.

10   　　　Your Honor, I don't have that as a condition of Mr. Creek's

11   plea agreement.

12   　　　　　THE COURT:  I thought that was a standard condition in

13   these pleas.

14   　　　　　MS. FIFIELD:  It often is a part of the negotiations,

15   particularly in misdemeanor cases.  It's not universally a part

16   of the plea agreement.

17   　　　　　THE COURT:  In the felony cases, it's not necessarily

18   included?

19   　　　　　MS. FIFIELD:  I'm not sure what happened in this

20   specific case.  I was not the assigned attorney when this plea

21   agreement was reached.  I don't know if there were conversations

22   about it, but I don't see it as a condition of this plea

23   agreement.

24   　　　　　THE COURT:  All right.  And restitution in this plea

25   agreement is higher than the misdemeanors?  It's $2,000?

 1          MS. FIFIELD:  Correct, and that is standard.

 2          THE COURT:  All right.  Okay.  Those are all my

 3   questions right now, Ms. Fifield, if you would like to show the

 4   relevant videos.

 5          MS. FIFIELD:  Your Honor, I was intending to play them

 6   as a part of the government's allocution.

 7          THE COURT:  That's fine.

 8          MS. FIFIELD:  Okay.  Would you like me to begin with

 9   the allocution?

10          THE COURT:  Yes, please.

11          MS. FIFIELD:  Thank you, Your Honor.

12      So just a couple of initial matters.  We've already spoken

13   about the exhibits.  They were submitted to the Court via USAfx.

14   Exhibits 8 and 9 are video exhibits that were submitted on

15   April 25th, and then slowed-down versions of those videos, as

16   well as a regular-speed video featuring a box highlighting the

17   defendant was submitted to that USAfx folder earlier this

18   morning.

19      Additionally, the government received a victim impact

20   statement from one of the officer victims yesterday.  That

21   letter was submitted to USAfx.  I will file it, but with the

22   Court's permission, I would like to read that as a part of the

23   government's allocution as well.

24          THE COURT:  That's fine.  And I take it all these

25   videos are available to the public?

1          MS. FIFIELD:  They will be submitted pursuant to the

2     Chief Judge's standing order.

3          THE COURT:  All right.  You may proceed.

4          MS. FIFIELD:  Thank you.

5     I will start where many of my colleagues have started in

6     these January 6 proceedings.  There are a few broadly applicable

7     statements about what happened on January 6 at the Capitol, and

8     I want to first ask the Court before getting into that to please

9     bear in mind, if any of this feels repetitive, that's because

10    we're dealing with thousands of rioters, hundreds of convictions

11    involving similar conduct.  It's repetitive because it all

12    happened at the same time in the same place one person at a

13    time.

14         THE COURT:  All right.  Sorry to interrupt.  I don't

15    know whether you're getting ready to get into all the background

16    about the general events of January 6, but you should presume

17    I'm familiar with what you filed in your sentencing memorandum.

18    You're welcome to cover some of it, but I don't need to hear all

19    the background leading up to January 6.  I would like you to

20    focus on Mr. Creek's actions.

21         MS. FIFIELD:  Thank you, Your Honor.

22    I only say that just to emphasize that while the Court may

23    be familiar with the general aspects of January 6, I think it is

24    important to keep the scale of the event in mind.  Mr. Creek was

25    one individual participating, but the government's position is

that his conduct cannot be separated from what was going on
around him.  It cannot be separated from what January 6 was as a
whole, which was an attack on the heart of democracy, the first
real threat in our nation's history to the peaceful transfer of
power.

Some individuals -- this was involving thousands of people,
but some individuals are more culpable than others, and Kevin
Creek is certainly one of those people.  Mr. Creek prepared for
the day on January 6 by packing a backpack containing a boot
knife and mace, per his statement to the FBI.  He and his three
associates whom he traveled with from Georgia also carried
radios in case the phones went down.  Creek and his associates
headed to try to view the former president's speech, and then
they turned to the Capitol.

Creek was only with two of his associates at the time he
reached the Capitol grounds.  At that point, his two associates
made the decision to stay back, while Creek made the decision to
push forward to the front of the line.

Creek reached the front of the line at around 2:30.  As
detailed in the government's sentencing memoranda, what was
going on at that time on the west front of the Capitol was a
growing crowd of rioters facing off with a sparse line of
police.  There are smaller groups that had reached that police
line, but at that point, at the point that Mr. Creek arrived,
the police line was largely still intact.

1          2:28 p.m. is a pivotal moment on the west front, and at

2     this point I would like to play the unedited version of Exhibit

3     8, again full speed and without an indicator box.

4          Can the Court confirm if you can see the video player?

5               THE COURT:  Yes, I can see it.

6          MS. FIFIELD:  I'm playing Exhibit 8 from the beginning

7     video marker 0:00.

8          (Video played.)

9               MS. FIFIELD:  Your Honor, in Exhibit 8, you can see

10    what I just talked about, which is the police line going from

11    generally intact to completely breaking.  Again, that was around

12    2:28 p.m.  This breach in the police line on the west front,

13    while there were again smaller groups that had been able to get

14    past the police and breach the Capitol building prior to 2:28,

15    this breach of the police line was pivotal in the riot in the

16    sense that while police were totally overwhelmed while they were

17    distracted trying to, frankly, protect their own bodily

18    security, thousands of -- it's impossible to say how many people

19    got through, but it's fair to characterize the rioters that were

20    able to get past the police at that point as a flood, creating

21    additional breach points in the Capitol building itself.

22         Further, I think it's important to point out that, you

23    know, this video, Exhibit 8, is being filmed by, we believe, a

24    rioter on the Upper West Terrace, and the energy is -- I think

25    it's fair to characterize it as gladiatorial, but instead of one

fighter, we have hundreds, maybe thousands.  And we go from

isolated brawls between a handful of rioters and a few officers

to a full-on melee.

And this was Kevin Creek's moment.  At 2:28 -- this

individual is referred to as Officer J.C.M. in the sentencing

memoranda.  He is actually a sergeant.  So I will refer to him

as Sergeant J.C.M. going forward.

At 2:28, Sergeant J.C.M. was one of relatively few officers

attempting to hold this line.  Mr. Creek emerged from behind the

front of the rioters' line and grabbed Sergeant J.C.M. around

the chest and throw him backwards several feet across the plaza.

It was at this time that the police line crumbled and the plaza

descended into chaos.

Now I will play -- I can play both the regular speed with

the box highlighting the defendant or the slow version or both.

THE COURT:  Let's start with the slow version.  I've

watched the video at the regular speed.

MS. FIFIELD:  Sure.  If I can confirm that the Court

can see the video player.

THE COURT:  Yes, I can see it.

(Video played.)

MS. FIFIELD:  Just pausing briefly to note that a red

box has appeared in the player highlighting the defendant.  You

can see his camouflage hat in the bottom left corner of that red

box.  You can also see at this point how close he is to the

1    front of the line where the officers are attempting to hold

2    rioters off.  I paused it 00:03 into the video player, and this

3    is at 00:03 of the slowed-down version.

4        (Video played.)

5        MS. FIFIELD:  I've paused at 1:17 into the slowed-down

6    version of Exhibit 8.  You just saw Mr. Creek throw the object

7    that the government believes is a ratchet strap or something

8    similar.

9        At this point, Your Honor, with the Court's permission, I

10   would like to point out that Mr. Thomas Webster, whose trial is

11   currently -- I believe the jury has the case in the trial of

12   Thomas Webster.  He's also visible in these videos, and an

13   officer, a U.S. Capitol police officer gave testimony on

14   April 26 that I believe would be helpful to the Court in

15   explaining what is going on in this area at the time.  With the

16   Court's permission, I would like to read a portion of that

17   transcript.

18       THE COURT:  Sure.

19       MS. FIFIELD:  Thank you.  In this transcript, my

20   colleague is questioning U.S. Capitol Police Officer Joanna

21   Berger, who was assigned to the Civil Disturbance Unit, or the

22   CDU.  She's referring to the same scene that's visible in

23   Exhibit 8.  This testimony was given on April 26 in the Thomas

24   Webster trial before Judge Mehta.

25       My colleague begins her questioning in the portion that I'm

going to read saying:

"Question:  You indicated that you were scared to take off your helmet near the line.  Why was that?

"Answer:  There were a lot of things being thrown.

"Question:  What was being thrown?

"Answer:  Anything that the crowd could get their hands on. I saw a lot of things, metal pipes, wood, water bottles, just like anything.

"Question:  And were you hit by any item?

"Answer:  I was.

"Question:  What were you hit by?

"Answer:  A piece of wood, a 2-by-4."

I would like to move to a different portion of the transcript.  My colleague asked the witness:

"Question:  How would you describe the demeanor of the crowd as you were manning the right side of the media tower?" which is visible in both Exhibit 8 and 9.

"Answer:  Aggressive.  The crowd was mixed.  There were some people there to peacefully protest, I would say, although at that point they had already breached the line that they shouldn't have.  Then there were people who were aggressive and agitators, as I would describe them, because they got the crowd going.  Essentially, when they start agitating, it's almost like a mob mentality, and other people start behaving in the same fashion.

1    "Question:  Did any of the rioters in front of you ever try

2    to cross the barricades?

3    "Answer:  Yes.

4    "Question:  What did you do -- I'm sorry.  Let me rephrase

5    that.  Did you ever ask them or instruct them to get back?

6    "Answer:  Yes, ma'am.

7    "Question:  Did they listen to you?

8    "Answer:  All of our commands were ineffective.

9    "Question:  What do you mean by ineffective?

10   "Answer:  No one was listening."

11   The last portion of the transcript that I would like to

12   read was my colleague asking:

13   "Question:  Did the rioters eventually breach your line,

14   and can you describe what that was like?

15   "Answer:  It was extremely dangerous, and that was a very,

16   very scary moment.  Not only did you have all of these people in

17   front of you not knowing if they were armed or not and they were

18   using everything as weapons as it was, but now you had people to

19   your right, to your left, behind you.  You couldn't even keep

20   your attention on the threat because it was all around you at

21   that point."

22   So in the slowed-down version of Exhibit 8, the Court could

23   see Mr. Creek emerging from the -- inside the line on the bottom

24   half of the screen from the south -- or pardon me, the west side

25   of the west front -- sorry.  I'm getting my directions turned

around.  This is on the north side of the west plaza.  He

grabbed Sergeant J.C.M. around the chest and dragged him

backwards across the plaza.  It is simultaneous to this event

that the line of police in the west plaza crumbled.

Mr. Creek's role in this critical moment was not calm.  It

was not enough to say that he was a member of the crowd, that he

broke the line with the crowd.  He broke the line.  He charged

Sergeant J.C.M. as the remainder of the rioters around him

collapsed the line of fencing.  He was not only responsible for

assaulting Sergeant J.C.M. in that moment.  J.C.M. was on the

line to defend the Capitol, and Creek prevented him from doing

that.  Creek prevented him from doing anything other than

protecting himself.

At this point, with the Court's permission, I would like to

read Sergeant J.C.M.'s victim impact statement.

"On January 6, 2022, I was a sergeant assigned to Civil

Disturbance Unit 42 of the Metropolitan Police Department.  I

was the direct supervisor of a squad of seven officers and one

of five supervisors overseeing a platoon of 28 officers.

"Prior to being assaulted by Mr. Creek, I spent a half an

hour using verbal commands and my physical presence to hold the

crowd back.  To that point, this had been successful, as a great

number in the crowd were not assaultive towards me or my

officers.

"As a supervisor on the CDU line, I am responsible to not

only stand on the line, but to also ensure the other officers hold their position.

"At 2:25 p.m., tear gas munition was thrown back into the CDU line where I and most of my officers were without gas masks. As those without masks fell back, I pushed the officers with gas masks forward and was able to maintain the line.  When I stepped back to don my gas mask, the line was intact.

"At 2:28, the portion of my line began to be pushed back. I returned to the line and tried to hold my officers in place. I can't say I was the only supervisor on this portion of the line at that point, but if anything, I was one of only a few.

"It was at this moment that Mr. Creek came out of the crowd, grabbed ahold of me around my chest, and drove me backwards and off the line.  By the time I was able to free myself, my portion of the line had collapsed, and the situation developed into a melee.

"Prior to Mr. Creek grabbing me and pushing me off the line, I had an established police line with a minimum of force being used either by or against my officers.  After Mr. Creek's actions, I had dozens of individual fistfights between citizens and officers with no hope of restoring order.

"I can't say that with me present I would have been able to restore my portion of the police line, but I would have stood a better chance.  The aggressive actions of Mr. Creek and others who engaged in similar assaults on the police line at that

specific time are responsible for it breaking.  Failure to hold

that line led to dozens or even hundreds more injuries on the

west side of the Capitol during what became a seize lasting

until after 5:00 p.m.

"As a result of the January 6 riot, I suffered only minor

bruises and abrasions.  My wife spent the day caring for our

two-year-old daughter, watching the news coverage, and fielding

calls from my family and friends.  Everyone wanted to know how I

was, and all she could say is that she hadn't heard from me.  I

ultimately called her around 6:00 p.m. to let her know that I

wasn't too badly hurt, and I couldn't say when I would be home.

"I had been a police officer for ten years at that point,

and I had always felt I carried the physical dangers of the job

well.  It is the impact to my family I have trouble with.

Inflicting four hours of anxiety and dread on my wife is

something I can't forgive myself for, and as a result, I cannot

forgive Mr. Creek for his part in it.

"Thank you for taking the time to consider my statement."

Signed, Sergeant J.C.M.

After his assault on Sergeant J.C.M., Creek wasn't done.

He gestured -- after smacking J.C.M. in the face shield, after

he drove him across the plaza, he gestured towards his Marine

Corps hat.  The Court can see this in Exhibit 8, both the

regular-speed and slowed-down versions.  We can't know -- given

we can't hear, we wouldn't be able to hear any audio from

1    Mr. Creek specifically, both because it's too far away and

2    because the din of the crowd is deafening, we can't know what he

3    is saying or what he meant by that gesture for sure, but it

4    seems fair to infer that the message was don't mess with me, I'm

5    a Marine.

6         Creek looks around.  He appears to be looking for someone

7    else to take on, and he found Officer R.S.E.  At this point, I

8    would like to play Exhibit 9, and I will play the --

9              THE COURT:  Ms. Fifield, sorry to interrupt.  Before

10   you get to Exhibit 9, did I just miss in Exhibit 8 the gesture

11   towards the hat?

12             MS. FIFIELD:  I can play it back, Your Honor, if that

13   would be helpful.

14             THE COURT:  Sorry.

15             MS. FIFIELD:  That's quite all right.  Can the Court

16   see the video player?

17             THE COURT:  Yes.

18             MS. FIFIELD:  Okay.  I have paused the slow version of

19   Exhibit 8 at 0:22 into the slow version.  We can see the red box

20   around Mr. Creek and Sergeant J.C.M. as he's driving him

21   backwards across the plaza.

22        And for the Court's reference and information, this

23   gentleman over here in the red jacket is Thomas Webster.

24        (Video played.)

25             MS. FIFIELD:  So I paused at 0:33 into the slow

1    version.  We just saw Mr. Creek smack Sergeant J.C.M. in his

2    face shield, and the gesture to the hat is coming up.

3         (Video played.)

4              MS. FIFIELD:  Was the Court able to see the gesture?

5              THE COURT:  It's tough.  Do you have a picture of that

6    in your filing?  I'm looking at it now.

7              MS. FIFIELD:  Sorry.  Do we have a picture of that?

8              THE COURT:  Do you, yes.

9              MS. FIFIELD:  I don't believe we have a picture

10   specifically of that gesture.  As the Court points out, it's

11   hard to see.  In my opinion, in watching these videos several

12   times, it's difficult to catch some of the specifics of these

13   things unless you see them in motion.

14             THE COURT:  Are you capturing -- are you recognizing

15   this because you've seen the body cam footage from Officer

16   J.C.M.'s camera that shows this more clearly?

17             MS. FIFIELD:  No, no.  I saw this clearly for the

18   first time watching these videos when I came on to the case.

19   And I think the gesture is clear.  I think it might be helpful

20   to play the regular-speed version of Exhibit 8, as that also has

21   a box highlighting the defendant.

22        Sorry, Your Honor.  I'm not seeing the button to share my

23   screen.  Here we go.  Is the Court able to see the video?

24             THE COURT:  Yes.

25             MS. FIFIELD:  This is in exhibit labeled Exhibit 4.

```
1    We can see at 0:41 into the video player of this exhibit the red
2    box indicating Mr. Creek and Officer J.C.M. being pushed across
3    the plaza.  Sergeant J.C.M.  Pardon me.
4        (Video played.)
5            MS. FIFIELD:  That was it.  Was the Court able to see
6    that?
7            THE COURT:  Sort of.  Okay.  Go ahead.
8            MS. FIFIELD:  Thank you.
9        At this point, I would like to play Exhibit 9, which more
10   clearly shows the second assault on Officer R.S.E.  And I will
11   play the version with the indicator box at full speed first.
12       Is the Court able to see the video player?
13           THE COURT:  Yes.
14           MS. FIFIELD:  So at this point what we are seeing is
15   right after Mr. Creek has pushed Sergeant J.C.M. across the
16   plaza.  It's difficult to see him in the beginning of this
17   video, but if the Court can see my cursor --
18           THE COURT:  Yes.
19           MS. FIFIELD:  -- he's near the top of the red box
20   here.  We would ask the Court to watch that area.
21       Again, this is Exhibit 9 with indicator box playing at
22   regular speed, and I'm starting the video at 0:01 into the video
23   player.
24       (Video played.)
25           MS. FIFIELD:  I've paused the video at 0:28 into the
```

1    video player.  What we just saw is Mr. Creek smacking Sergeant

2    J.C.M. in his face shield.  And after he backs away from

3    Sergeant J.C.M., as an aside, we can't really see the gesture

4    towards his hat in this video because the camera pans away from

5    Mr. Creek and doesn't show him at that point.  But after that,

6    it looks like he is looking around for what to do next or, in

7    the government's view, his next officer to assault.

8         I'm going to, with the Court's permission, play Exhibit 9

9    slowed down.  Can the Court see the video player?

10              THE COURT:  Yes.

11         MS. FIFIELD:  This exhibit is labeled Exhibit 9 Slow.

12   I'm starting it at the 00:00 marker on the video player, and as

13   I discussed earlier, this is the tail end of Mr. Creek pushing

14   Sergeant J.C.M. across the plaza.

15         (Video played.)

16         MS. FIFIELD:  Okay.  Mr. Creek pleaded guilty to a

17   single count of 111(a)(1), and it is incredibly fortunate that

18   both officers were not seriously injured, either by Creek or by

19   other rioters after Creek left them vulnerable.  As the Court

20   pointed out earlier, the absence of his -- the fact that the

21   government did not rely on Mr. Creek throwing this object that

22   we believe to be a ratchet strap is why he's not facing charges

23   in the enhanced portion of the 111 statute like many other

24   assaults that have been sentenced already.

25              THE COURT:  So is Officer J.C.M. the only one to have

1    really any injuries at all, and he says he had, what, minor

2    abrasions and bruises?

3                MS. FIFIELD:  That's correct.

4                THE COURT:  That doesn't qualify under the guidelines

5    for an enhancement, does it, because it wouldn't necessarily

6    need medical treatment?

7                MS. FIFIELD:  That was the position that the

8    government took.  He did not seek medical treatment either for

9    his interaction with Mr. Creek or for any other interaction that

10   day.

11               THE COURT:  All right.

12               MS. FIFIELD:  Turning to the 3553(a) factors, I just

13   described and showed the Court in detail these video exhibits

14   showing not just what Mr. Creek did, but what was happening

15   around in that context.  And that was, Mr. Creek was one of the

16   instrumental members that helped break this line, overwhelm

17   police officers, and prevent them from protecting the Capitol.

18       It's also important to note that Mr. Creek split off from

19   his friends, who, upon reaching Capitol grounds or moving

20   slightly forward towards the Capitol building, both of the two

21   men that Mr. Creek was with decided to stay back.

22       Thus far, from what we can tell, he's exhibited no

23   contrition and no recognition of wrongdoing.  It's difficult to

24   know, not having been present myself during his FBI statement

25   and I don't know what he said to the PSR writer, but what we do

know is that he -- he said he didn't remember assaulting these officers in his FBI statement, and when asked whether he regretted his conduct by the case agent, he said 50/50, and the 50 percent that he regretted was being in trouble with the FBI and having to talk with the FBI and having to go through enhanced screening at the airport.

In terms of his history and characteristics, Mr. Creek appears to be a stable business owner, and he has a family and has been compliant with his conditions of release.

However, his military history, which would ordinarily be mitigating, is very troubling in this context.  His conduct, assaulting these officers, disrespects the oath that he took to defend his country, and the gesture to the hat pretty clearly indicates, at least from my perspective, that he's invoking his history as a Marine to intimidate immediately after assaulting a police officer.

So the government submits that his military history under these circumstances is entitled to no mitigating weight.  If anything, it's aggravating.

In terms of the seriousness of the offense and the need to promote respect for the rule of the law, there's arguably no greater disrespect to the rule of law than assaulting law enforcement officers who are sworn to protect the Capitol, the citadel of democracy.  Only a significant sentence can communicate to anyone else seeking to imitate him in the future

how seriously the law takes this kind of violence in the context of an attack on the democratic process.

The need to seek deterrence, general deterrence, as I just stated, a meaningful, significant sentence is needed to send a message to the public that this kind of response to a political grievance is not appropriate.

In terms of specific deterrence, given -- we have yet to hear from Mr. Creek today, but given what we've heard from him thus far through the PSR writer and through the case agent, Mr. Creek needs to be made to understand the seriousness of his conduct. He has expressed no remorse thus far. He's gone so far as to claim that he didn't remember assaulting these officers in the FBI interview and at the very least confusing the PSR writer as to whether he was denying or admitting to these assaults.

THE COURT: Ms. Fifield, before you continue, let me ask you one question. It seemed to me, when I was watching the video that reflected the throwing of the red strap -- and I agree with you, it does seem to be an object that had weight on it, although I don't know that we can conclude exactly what it was based on the evidence you've presented. Am I correct that the officers in the area where Mr. Creek threw the strap, some of them didn't have helmets and riot guards on, facial riot guards?

MS. FIFIELD: It's my understanding both from Sergeant

1    J.C.M.'s victim impact statement and from the testimony that

2    Officer Joanna Berger of the U.S. Capitol Police gave in the

3    Thomas Webster trial that was the case.  And I understand that

4    officers who had full helmets were trying to move to the front

5    of the line to protect officers who didn't have those full

6    helmets or helmets with face masks.

7            THE COURT:  If you're moving on to -- tell me what

8    you're about to talk about, because I did want to ask you about

9    Mr. Creek's efforts to get in the Capitol.  And I guess that

10   your only evidence of that is what he told an emergency room

11   doctor or a hospital doctor several days after the event; is

12   that correct?

13           MS. FIFIELD:  That's correct, Your Honor.

14           THE COURT:  And refresh my memory on what he said.  My

15   understanding, I think, is that he said he couldn't get in

16   because the door he chose was one where officers were gassing

17   people, and that's why he's at the hospital, because he's having

18   continuing effects from the gas?

19           MS. FIFIELD:  Your Honor, that's correct.  And based

20   on what we, the government, my colleagues know about the anatomy

21   of the riot, our best guess is that the door that Mr. Creek is

22   referring to is the door in the lower west tunnel, which is

23   where, as discussed in the government's sentencing memorandum,

24   some of the most significant violence took place on January 6.

25   There was an extended battle in the doorway between police

1    officers and rioters, one of whom was Duke Wilson, which is

2    discussed in the government's sentencing memorandum, and the

3    assaults in that area included the assault of Officer Michael

4    Fanone, and I'm sorry, I don't know how to pronounce the other

5    officer's name, but I believe it's -- pardon me.  It's Daniel

6    Hodges is the other MPD officer who testified before Congress.

7              THE COURT:  All right.  And how was the government

8    made aware of the statements that Mr. Creek made to the

9    emergency room doctor?  That doctor reached out to the FBI?

10             MS. FIFIELD:  He submitted a tip, yes.

11             THE COURT:  All right.  Sorry to interrupt.

12             MS. FIFIELD:  No apologies necessary, Your Honor.

13             THE COURT:  What can you say about his efforts to help

14   a female police officer who fell down that day?

15        I understand that the government does not dispute that,

16   though it's not reflected in any video evidence that you've

17   shown the Court.

18             MS. FIFIELD:  Correct.  The government has seen no

19   verification of that incident.  We've also told defense counsel

20   that we also have no information to dispute it.

21             THE COURT:  So at this point, it's Mr. Creek's

22   representation with no corroborating evidence?

23             MS. FIFIELD:  Correct.

24             THE COURT:  All right.

25             MS. FIFIELD:  Your Honor, the only two 3553(a) factors

remaining that I was going to briefly summarize for the Court or briefly touch on are the helpfulness of the guidelines.  The government believes that the guidelines, especially here, given the Court's agreement with the plea agreement, the guidelines here are helpful and, we believe, fairly capture Mr. Creek's conduct and its impact.

Finally, in terms of disparities, the government stated in its sentencing memorandum it is difficult to compare what was going on in this 111(a)(1) case in the context of January 6 and other 111(a)(1) cases outside of the context of January 6.  And thus far, only a handful of defendants in January 6 cases have been sentenced for assault -- sentencing cases related to assault on law enforcement.  As noted in the government's brief, most of those involve the enhanced version of the 111 statute, 111(b).

THE COURT:  And am I correct, Ms. Fifield, that all with the exception of the Leffingwell case involved convictions under 111(b)?  Is that right?

MS. FIFIELD:  That's my understanding, yes.

THE COURT:  Okay.  And they range -- in those cases involving the aggravated charge, the sentences ranged from 41 to 63 months in prison?

MS. FIFIELD:  Your Honor, the sentences imposed by the Court?

THE COURT:  Yes.  I think Judge Lamberth imposed 41

months, I believe, in Fairlamb, 51 months in Wilson, 46 months

in Thompson.   Judge Bates sentenced Languerand to 44 months, and

Judge Chutkan sentenced Palmer to 63 months.

Does that sound right to you?

MS. FIFIELD:  Yes, those numbers are correct.

THE COURT:  All right.  Judge Amy Berman Jackson

sentenced Leffingwell, who was charged with violating Section

111(a), to six months.  The guideline range in that case, like

this case, was 24 to 30 months.

It does seem, though, that there are some mitigating

factors in that case that aren't present here, one being the

extreme remorse that the defendant expressed, and second, Judge

Jackson credited the multiple traumatic brain injuries that that

defendant has sustained as triggering his overreactions to the

officers.

MS. FIFIELD:  Correct.  And the government would also

point out that with those mitigating factors, of the cases

summarized, highlighted in the government's brief,

Mr. Leffingwell is the only defendant who did not receive a --

sorry.  My apologies.  I was going to say the only defendant not

to receive a guideline sentence, but Mr. Languerand --

THE COURT:  Judge Bates went slightly below the

guidelines.

MS. FIFIELD:  Yes.  But generally speaking, even

though these defendants were sentenced under 111(b), they

1    received at or near guideline sentences.

2           THE COURT:  And the distinction is the dangerous

3    weapon enhancement in these cases?

4           MS. FIFIELD:  That is a reason for the higher

5    guidelines range.  The government has requested a sentence at

6    the midpoint of the guidelines range here, which I believe is

7    consistent in most of those cases.  My colleague, Ms. Mittal,

8    can speak to that specifically, if the Court is interested.

9           THE COURT:  That's all right.  I've reviewed all of

10   those cases.

11          MS. MITTAL:  Your Honor, just for clarification, I

12   believe that the 111(b) cases were Palmer, Languerand, and

13   Thompson, and the 111(a) cases were Leffingwell, Wilson, and

14   Fairlamb.

15          THE COURT:  Okay.  Wait.  Hold off on that.  So the

16   111(b) are which ones?

17          MS. MITTAL:  Palmer, Languerand, and Thompson.  And

18   the 111(a) cases were Leffingwell, Wilson, and Fairlamb.

19          THE COURT:  Leffingwell -- what's the other one?

20          MS. MITTAL:  Fairlamb.

21          THE COURT:  Fairlamb, and was there another?

22          MS. MITTAL:  For 111(a), Leffingwell, Duke Wilson, and

23   Scott Fairlamb.

24          THE COURT:  Okay.  Those are all 111(a), but still,

25   with respect to Fairlamb and Wilson, they received a higher

guideline range principally because in those cases they used
dangerous weapons that qualify for the enhancement; is that
right?

MS. MITTAL:  Your Honor, I would need to double-check,
but my understanding is in all of these cases the higher
guidelines range is driven by the application of 2A2.2 and then
the official victim enhancement adjustment in each of these
cases, and in some cases, there was criminal history.

THE COURT:  But I think -- these guideline ranges are
often 40, 50 months.  We have the cross-reference here.  We have
the official victim here.  My point is, what's driving the
higher guideline range in these three cases that were prosecuted
convictions under 111(a) is the fact, is it not, that in those
cases the defendants -- the government proved at least the
defendants used a dangerous weapon?

I think in Fairlamb, I think the officer was punched with
a -- well, maybe not, maybe not in Fairlamb.  But in Wilson,
there was PVC pipe used, and Leffingwell, of course, didn't get
the enhancement.

Do you know what the situation was in Fairlamb?  It just
seems like the guideline range is so much higher, and I'm
expecting that it is because of this additional enhancement
that's not relevant or not proven here.

MS. FIFIELD:  Your Honor, I would have to check the
guidelines calculations in those cases, but both Scott Fairlamb

1    and Duke Wilson also pleaded guilty to 18 U.S.C. 1512(c)(2).

2            THE COURT:  Oh, well, that's -- Ms. Mittal, you're on

3    mute.  So that may be the driver in those cases.

4            MS. MITTAL:  Correct.  Under the grouping, the lead

5    count would be the 1512 --

6            THE COURT:  I see.  And I'm very familiar with Amy

7    Berman Jackson's case.  I'm less familiar with Wilson and

8    Fairlamb.  But in those cases, does the government know how

9    Judge Lamberth calculated the guidelines for the 111(a) charge?

10           MS. MITTAL:  Your Honor, I believe the transcript was

11   not specific, but I believe there was not a dispute between the

12   parties and the PSR in that case and that Judge Lamberth simply

13   adopted the calculation as agreed to by the parties.

14           THE COURT:  But you think he set a much higher level

15   under -- well, these aren't upward variances or departures in

16   these cases, are they?  The driver here is 1512(c)?

17           MS. MITTAL:  That's correct, Your Honor.

18           THE COURT:  Thank you.  That's helpful.

19           MS. FIFIELD:  Your Honor, to conclude, the government

20   is requesting 27 months' incarceration for Mr. Creek, which is

21   the midpoint of his guidelines range.  The government is

22   requesting $2,000 in restitution as agreed to by the plea

23   agreement and the mandatory $100 special assessment.

24       27 months is a significant sentence, a significant term of

25   incarceration, and it's the government's position that a

1    significant term of incarceration is necessary here.

2    Mr. Creek's behavior was enthusiastic and deliberate.  It was

3    also critical in this breach of the police line on the west

4    front.  Without Mr. Creek's actions and several more doing the

5    same thing that he was, breaches of -- additional breaches of

6    the Capitol building would not have occurred, and officers on

7    the west front would not have spent the next several hours

8    fighting for their own personal security rather than defending

9    the Capitol.

10        Thank you.

11            THE COURT:  All right.  Thank you, Ms. Fifield.

12        One moment.

13        All right.  Mr. Jones, now is your opportunity to allocute

14    on behalf of Mr. Creek, and I will also give Mr. Creek an

15    opportunity to address me if he desires.

16            MR. JONES:  Thank you, Your Honor, and Mr. Creek will

17    address you, Your Honor.

18        Your Honor, on the -- for clarification, on Sergeant

19    J.C.M., we will start with that, his letter to the Court, Your

20    Honor, I would like to bring to the attention of the Court that

21    in the discovery statement that the government gave to Mr. Creek

22    and his former lawyer, there was a statement in the discovery

23    that Sergeant J.M.C. and Officer R.S.E. didn't remember the

24    assault of Mr. Creek.  I think that's substantial due to the

25    statement that Sergeant J.M.C. -- J.C.M. gave to the Court.

1          THE COURT:  Let me interrupt you there and hear from

2     Ms. Fifield on that.  I, too, was surprised to hear he had a

3     victim statement in light of what had been stated, I think, in

4     the PSR that I had reviewed already.

5          Can you explain, Ms. Fifield?  What happened here?  Did

6     Sergeant J.C.M. have an opportunity to review the body cam

7     footage?  What refreshed his memory, or was that just factually

8     incorrect, the discovery that was provided initially?

9          MS. FIFIELD:  Your Honor, it's my understanding that

10    after I reached out to inform Sergeant J.C.M. of his rights

11    under the Crime Victims' Rights Act and asked him if he wanted

12    to provide a victim impact statement, he asked to review his

13    body-worn camera and then did, and he told me that that

14    refreshed his recollection as to the role Mr. Creek played

15    relative to the police line at 2:28 p.m.

16          THE COURT:  All right.  Thank you.

17          Mr. Jones, in light of that, what in particular about the

18    victim statement are you disputing?

19          I mean, it's quite clear from Exhibits 8 and 9, it's clear

20    to the Court that Mr. Creek assaulted this officer.  What

21    specifically in this letter gives you concern that the Court

22    might consider in sentencing Mr. Creek?

23          MR. JONES:  Your Honor, we will agree that Sergeant

24    J.C.M. was assaulted and Officer R.S.E., but just his

25    recollection as detailed from the statement, it's troubling that

1   at this stage that the statement comes up.

2           THE COURT:  All right.  The line in the victim impact

3   statement that I found most compelling is also clearly one

4   reflected in the video, which is at the time Mr. Creek attacked

5   Sergeant J.C.M., the line collapsed, and the situation developed

6   into a melee.  That's, to me, apparent from the video.  He said

7   he suffered only minor bruises and abrasions.  I kind of agree

8   with the government.  It's shocking that none of these officers

9   were actually hurt.

10      But beyond that, I don't see anything in this letter

11   that's -- this victim impact statement that's particularly

12   revealing.

13          MR. JONES:  Yes, Your Honor.

14          THE COURT:  I mean, I actually think it's helpful in

15   some ways to Mr. Creek.

16          MR. JONES:  It is, Your Honor, yes.

17      I would like to address the information when the FBI

18   interviewed Mr. Creek.

19          THE COURT:  Yes.  That would be helpful.  What were

20   those circumstances?

21          MR. JONES:  The circumstance was that he was notified

22   that they wanted to interview him.  He sought an attorney from

23   one of the members of the group that rode up with Mr. Creek.  I

24   think it was his uncle.  And he set an interview up with the

25   FBI.

1          In that interview -- from my understanding.  I was not

2     there, Your Honor.  From my understanding, the FBI showed

3     Mr. Creek some photos, and they asked Mr. Creek was that him.

4          We learned later that -- in discovery that the videos, the

5     facial recognition was inconclusive.  So Mr. Creek actually

6     helped the FBI identify himself in videos, in the photos they

7     showed him.  And from my understanding from reading it,

8     Mr. Creek was very helpful in the investigation on himself.

9               THE COURT:  Well, at that time, are you saying that

10    Mr. Creek didn't think that the FBI knew that he was the

11    individual reflected in the photos that they showed him?

12              MR. JONES:  Your Honor, I can't speculate as to that.

13              THE COURT:  Of all the thousands of people who were

14    present, one would suspect that if you're shown a photo of

15    yourself, that the FBI has figured out a way to identify you

16    separately than you telling them.

17              MR. JONES:  Yes, Your Honor; yes, Your Honor.  But we

18    know now that it was not them.  It was the ER physician who

19    actually tipped the FBI off.

20              THE COURT:  Your point is that Mr. Creek deserves a

21    lot of credit for that, but the FBI showed him his picture that

22    day and said is this you.  So he confirmed what they already

23    knew.

24              MR. JONES:  I don't know, Your Honor.  I don't know

25    what the FBI knew at that time.  But the --

1    THE COURT:  At that time how can you say that your

2   client was trying to assist the FBI when he denied recalling any

3   assaults?  Is that still his position today, he doesn't recall

4   assaulting these officers?

5    MR. JONES:  My understanding was that when they talked

6   to him, just like when Sergeant J.C.M., when he talked to the

7   FBI, he didn't remember the assault.  He said he didn't

8   remember, but when saw the pictures, he refreshed his memory,

9   and he did remember.

10    THE COURT:  He didn't remember that particular

11   assault.  He certainly remembered getting pummeled by a lot of

12   people on January 6.

13    MR. JONES:  Yes, Your Honor.

14    THE COURT:  Are you saying that as Mr. Creek sits here

15   he has no recollection independently of the video footage he's

16   seen that he committed assaults on that day?

17    MR. JONES:  Oh, he understands, yes, Your Honor.

18    THE COURT:  He understands, or he does recall?

19    MR. JONES:  He does recall, Your Honor.

20    THE COURT:  So what he said to the FBI at the time of

21   that interview was a lie?

22    MR. JONES:  I don't know if he actually -- I don't

23   know if he actually said that he didn't remember or he didn't

24   remember the assaults.  I know he remembers being there and

25   having an altercation.

1    THE COURT:  Your position is that Mr. Creek told the

2    FBI that he knew he was there, he identified himself, and he

3    recalled having altercations with police officers?

4    MR. JONES:  I think so, Your Honor.  I was not there

5    at the meeting, though, Your Honor.  So I don't know the actual

6    language.

7    THE COURT:  But your client was.  So your position is

8    that what the FBI is saying about that interview is not

9    factually accurate?  He didn't deny -- or he didn't claim he

10   couldn't recall the assault?

11   MR. JONES:  That's a question -- that's a question I

12   can't answer, Your Honor.  I've asked my client about this

13   incident, and he told me he remembers, and he did assault the

14   officers.  That is for sure.

15   THE COURT:  But you don't know what he said to the

16   agents that day?

17   MR. JONES:  No, Your Honor.  I was not there.

18   THE COURT:  All right.  My point is just the bigger

19   one.  It's really hard to credit him for being super cooperative

20   with the FBI in light of what the FBI says he said that day,

21   which is he confirms that he was the person reflected in the

22   pictures that they showed to him and he didn't recall assaulting

23   any officers and his regrets were 50/50.

24   MR. JONES:  Yes, Your Honor.

25   THE COURT:  That doesn't sound to me like someone who

1    is ready and willing to assist the FBI in its investigation.

2    That sounds like somebody who still hasn't accepted

3    responsibility for what he did on January 6.

4         MR. JONES:  Your Honor, I don't know the language that

5    Mr. Creek used, but Mr. Creek was very, very (distorted audio).

6         THE COURT:  He was very what?

7         MR. JONES:  He was very forward with them.

8         THE COURT:  Very what?

9         MR. JONES:  Forward in identifying himself and what he

10   did.  I don't think he was reluctant of accepting what he did,

11   his responsibility.  And from there, he narrated about the

12   female lawyer -- sorry, the female law enforcement officer that

13   he assisted also.

14        THE COURT:  Of course, because that made him look

15   better, not worse.  So he told the FBI that he assisted a female

16   officer, but he might not have told the FBI that he assaulted

17   other officers, at least according to the FBI.

18        MR. JONES:  Are you referring to the 50/50 statement,

19   Your Honor?

20        THE COURT:  50/50, and at least according to the

21   government's proffer is that he didn't recall assaulting anybody

22   in that interview.  That's what he said.

23        MR. JONES:  Yes, at that particular time.

24        THE COURT:  So my point is, that's not someone who is

25   really assisting law enforcement who deserves a lot of credit

1    for that interview.

2              MR. JONES:  After the interview, he pled guilty, Your

3    Honor, without --

4              THE COURT:  Oh, I know, and he gets credit for

5    acceptance of responsibility at the time of the plea, but the

6    subsequent comments the defense made to Probation about, you

7    know, the question whether he was even reflected in the video

8    and the question about whether he actually assaulted versus just

9    threatened to assault officers --

10             MR. JONES:  Your Honor, that was my misstatement.  It

11   was not Mr. Creek.

12             THE COURT:  No, I understand.  But that did give the

13   Court concern that despite his plea, his timely plea that saved

14   the Court and saved the government resources that he should be

15   credited for in terms of acceptance of responsibility, that gave

16   the Court concern, and I'm glad that you've clarified that

17   that's not, in fact, your client's position.  But I was

18   concerned --

19             MR. JONES:  Yes, Your Honor.  I apologize to the U.S.

20   Probation officer about that misstatement.

21             THE COURT:  All right.  Well, anyway, he did plead

22   guilty, and he is entitled to acceptance of responsibility, an

23   adjustment downward in the guideline range for that early plea,

24   a three-level.

25        The government doesn't dispute that, right, Ms. Fifield?

1        MS. FIFIELD:  Your Honor, the government, as stated in

2    its supplemental sentencing memorandum, supports a two-level

3    reduction and an additional one-level -- and will move for an

4    additional one-level reduction, assuming the defendant

5    forthrightly admits the conduct that he admitted to in the plea

6    agreement today.  If he --

7        THE COURT:  Understood.

8    Okay.  Mr. Jones?

9        MR. JONES:  Yes, ma'am, Your Honor.

10   The sort of planning with the boot, knife, the mask, and

11   radio with the other parties that went to D.C. with Mr. Creek,

12   we don't know if the other parties were interviewed by the FBI,

13   but we know they were not indicted by the FBI.  There was no

14   conspiracy to -- with those items.

15       THE COURT:  He doesn't deny taking those items to

16   Washington?

17       MR. JONES:  No, Your Honor.

18       THE COURT:  And having them with him at the Capitol

19   that day?

20       MR. JONES:  Correct; no, Your Honor, we don't deny

21   that at all.

22   I looked at the video.  I don't understand about the

23   gesture to the hat.  I think that's --

24       THE COURT:  It's not critical to the sentencing.

25       MR. JONES:  Okay.  Yes, Your Honor.

1      Your Honor, I understand that you said it was -- what he

2 said about him helping the female officer, I've talked to the

3 past AUSA Strain, and we agreed that they would stipulate to

4 that and they wouldn't challenge that.  We had an agreement for

5 the purpose of we wouldn't delay sentencing and look for video

6 to show that.

7      THE COURT:  You mean the helping the female officer?

8 Is that what you're referring to?

9      MR. JONES:  Yes, Your Honor.

10      THE COURT:  All right.  Well, the government's not

11 disputing that.

12      MR. JONES:  Okay.  That's one of my main concerns.

13 That's one of my main points.  Whereas, in Leffingwell, he saw

14 the officers that he assaulted when he was locked up in the

15 jail, and they came up to him, and he apologized to them.

16    In Mr. Creek's case, he made two serious assaults on two

17 officers, and right after that, he assisted a female officer.  I

18 think that is just as strong as in Leffingwell.

19      THE COURT:  Not so much.  I mean, he then had that

20 interview with the FBI that was less than forthcoming.

21      MR. JONES:  Yes, Your Honor.  And I was not there,

22 like I said before, but I think the interview was more of a

23 shock to Mr. Creek.  That was a voluntary interview.  He was not

24 charged.  I don't know what conversation his past lawyer and he

25 had prior to the interview.  I don't know if they -- did they

1    tell him hey, you know, you need to be open and honest from the

2    initial or you shouldn't interview.  I don't know what their

3    conversation was.  So I can't defend on how the interview went,

4    Your Honor.

5         In the interview, from my understanding, there was not an

6    agreement prior to the interview what it was to be used for or

7    the purpose of it, from my understanding.

8             THE COURT:  You didn't challenge that as an

9    involuntary statement.

10            MR. JONES:  No, I did not, Your Honor.  I don't know

11   what happened prior to the interview and the background on

12   preparing for the interview on knowing what the consequences are

13   for not being truthful and honest with the FBI on the initial.

14        Should I continue, Your Honor?

15            THE COURT:  Yes.  Are you done?

16            MR. JONES:  No, ma'am.

17        In light of Mr. Creek's criminal history and his family

18   ties, community ties, I think that warrants some variance.

19            THE COURT:  You're not seeking any departure, just

20   variances under 3553(a); right?

21            MR. JONES:  Yes, Your Honor.

22            THE COURT:  Okay.

23            MR. JONES:  We think that -- Mr. Creek pled to one

24   count of 111(a), and since he's been on probation, presentence

25   release, he's done everything that was asked of him.  And I

1    think a sentence similar to Leffingwell shows assertions of his

2    actions.  I truly believe that Mr. Creek is remorseful.  It may

3    not show that as loud as it should have in the first interview

4    with the FBI, but he has a statement for the Court stating that.

5         With the minor injury -- although there was serious assault

6    against Sergeant J.C.M. and Officer R.S.E., we're lucky and

7    fortunate that they were only a minor injury to Sergeant J.C.M.,

8    and we understand that also.

9         I think that's it, Your Honor.

10            THE COURT:  Thank you, Mr. Jones.

11        Mr. Creek, you have the right to make a statement if you

12   would like to do so.  Is there anything that you would like to

13   say to me before I give my reasons and impose sentence?

14            THE DEFENDANT:  Yes, Your Honor, there is.  Can you

15   hear me?

16            THE COURT:  Yes, I can hear you.

17            THE DEFENDANT:  Yes, ma'am.  First and foremost, I

18   would like to express the fact that I take full responsibility

19   for this and my actions.  I do.  The thought that I'm not

20   remorseful is completely not correct.  I am very sorry.  I'm

21   very remorseful.  I regret tremendously assaulting those two

22   officers.

23        I'm sorry.  I apologize.

24            THE COURT:  Take your time.

25            THE DEFENDANT:  I do want to apologize wholeheartedly

1    to the officers and their families.  I want to apologize to my

2    wife and my children for my conduct.  I am a former Marine.

3    That's stated.  And yes, my conduct was not reflective of the

4    Marine Corps values.  And that's not my character.  My father

5    was a police officer, and he was also a United States marshal in

6    Atlanta.  He was in law enforcement just like those officers

7    were that I assaulted.

8        I very much so regret this.  I'm sorry if I caused these

9    officers any trauma in any way, their family any trauma in

10   any way.  I am truly sorry for this.  I don't know how else to

11   say it.  I've been struggling with this for months.  I take full

12   responsibility.  I understand my actions.  I know what I did.

13       We went there -- I went to D.C. with the intentions of just

14   going to the rally with some friends.  Yes, things got very

15   chaotic.  I became very -- I was very impulsive with what I did,

16   and it was very bad judgment.

17       Your Honor, I don't know how else to say I'm sorry.  I know

18   that you -- I know that I have to be punished for this.  I

19   understand.  Again, I'm truly sorry.  That's all I have to say.

20            THE COURT:  Thank you, Mr. Jones.  I appreciate your

21   comments, and I do believe your remorse now is genuine and

22   heartfelt, and I appreciate what you've said.

23       Is there any reason why sentence should not be imposed at

24   this time?  Ms. Fifield?

25            MS. FIFIELD:  Nothing from the government.

1          THE COURT:  Mr. Jones?

2          MR. JONES:  No, Your Honor.

3          THE COURT:  All right.  So before I impose my

4     sentence, I do want to give the reasons for my sentence.

5          I'm required to consider the various factors outlined in

6     Title 18 United States Code Section 3553(a).  I'm familiar with

7     all of those factors, and I have considered them here, even if I

8     don't mention each one of them.

9          So let me start with the nature of the offense.  Mr. Creek

10    is charged with a serious felony offense, convicted of a serious

11    felony offense, assault of federal officers on January 6.  He

12    and others and a violent mob that he joined engaged in an

13    unprecedented attack on the U.S. Capitol building and the police

14    officers who fought bravely to defend it.

15         As I and many of my colleagues have said repeatedly, the

16    actions of the individuals who participated in the January 6

17    events undermine the rules of law and our democracy.

18         Even though there is no evidence that Mr. Creek left his

19    home intending to storm the Capitol, and I believe that to be

20    true, the evidence in this case is clear that at some point on

21    January 6 he made the decision, one he describes as impulsive,

22    but nonetheless, he made the decision to go toe to toe with

23    police officers on the west side of the Capitol.

24         It's also undisputed that he came to D.C. prepared for

25    violence.  On January 6, he carried a daypack with mace, a

knife, radio, and a first aid kit.  Regardless why he initially
decided to carry those items, again, at some point, he made a
deliberate choice to join this large, out-of-control crowd at
the Capitol that had gathered on the west side.  Mr. Creek's
friends opted out, decided not to join him, but he was
determined to get to the front of the line, the front of the
crowd, even though there was tear gas and chemical irritants in
the air, even though he admitted, I think, in the interview with
the FBI that he saw police officers defending the top steps on
the Capitol with what he described as cancer-looking guns.  He
also admitted to seeing at least one of the rioters with a gun
tucked in his waistband.  And yet, he stayed there.

And at approximately 2:28 p.m., he, along with others in
the crowd, played a very pivotal role, one that's reflected in
the videos that we've watched here and confirmed by the
statement of Sergeant J.C.M., who basically just gave words to
what's visible in those video clips.

But Mr. Creek and others played a very pivotal, critical
role.  They pushed through bike rack barriers that a very small
number of police officers had set up to protect themselves.
Multiple videos show him forcefully driving a police officer
that we now know to be J.C.M., Sergeant J.C.M., backwards into
the violent crowd of rioters.  After Mr. Creek let go of that
officer, he hit him in the face shield of the officer's helmet.
These actions are clearly captured on Exhibit 8.

And also clearly captured on the video is the role that he
played in breaking that line and contributing to the melee that
developed.  As you listen to those videos, the noise from the
crowd is deafening.  It's very -- it's overwhelming for those
police officers who stood just a single line in front of a large
mob of hundreds, if not thousands, in front of them.

The government has made a point of emphasizing that
Mr. Creek pointed at his Marine Corps cap in an effort, the
government views, as one to intimidate Sergeant J.C.M.  I have a
hard time seeing -- I'm not denying that that happened, but I'm
not able to see as clearly as the government can.  And the
government has watched these videos many more times than I have,
but I've watched them several times.  And while I see his arm
moving, it's difficult for me to say for certain that that's
what he was doing.  But it's not essential to the sentence that
I'm imposing here.

It's undisputed that Mr. Creek is a former Marine and that,
as he admitted here, what he did was completely inconsistent
with the values that he held as a former Marine officer of the
United States.

But regardless of whether he pointed to his Marine Corps
cap in an effort to intimidate the officer, the fact is, he then
attacked another officer who was trying to defend himself behind
a bike rack barrier and a police shield.  Mr. Creek shoved and
kicked that officer, causing him to fall to the ground.  When

that officer tried to get up, another rioter pushed that officer back down to the ground.

But these assaults weren't enough for Mr. Creek. He then picked up a large red strap that the government describes as a ratchet strap. I agree with the government, having watched the video multiple times, that the strap appears to have some weight on it. I don't think that Mr. Creek would have been able to throw it like he did without some heavy weight on it. But I can't determine based on the videos alone what that strap was.

And if it had been, if it was a ratchet strap with heavy metal buckles on it, then it certainly would qualify as a dangerous weapon that would result in an additional four-level enhancement under the guidelines if proven.

But that's not the case here. The government's unable to prove that. That's its theory, and I don't find that theory incredible. I just can't find by a preponderance of the evidence that that strap was a ratchet strap with metal on it. Therefore, I won't apply the two-level enhancement.

Unfortunately, there's no evidence before the Court that Mr. Creek's assaults caused any of his victims bodily injuries, just bruises and abrasions. Again, had they, it would have resulted in at least a three-level enhancement upward. But fortunately for him, the officers weren't injured.

But viewing the videos, again, it's very hard for the Court to see why those assaults didn't injure the officers. Mr. Creek

put multiple officers at great risk as they retreated and were

outflanked from all sides by the large violent mob.  And it's

surprising that, at a minimum, none of the officers were stomped

on by any of the rioters who were storming ahead towards the

Capitol.  And it's gratuitous that none of the officers who

didn't have face shields or helmets were hit by whatever he

threw in their direction.

Mr. Creek did not enter the Capitol that day.  Based on

statements that he made to an emergency room doctor that are not

disputed here, it wasn't for lack of trying.  According to the

proffer here, he told the emergency room doctor several days

later when he sought treatment for the tear gas that he had

inhaled that day that he was unable to go inside the Capitol

because he went to the wrong door, that the door he tried to

enter was guarded by police officers who were, in his words,

gassing people as they tried to go through the door.

Mr. Creek asserts and the government doesn't dispute that

he helped a female police officer who was injured that day.  He

also asserts that he provided first aid to others in the crowd

who were injured.  The Court has no reason to doubt that

proffer.  Even so, it makes his aggressive actions against the

other officers all the more perplexing to the Court, especially

given his previous honorable service in the U.S. military.

Looking beyond the nature of the offense to Mr. Creek's

history and characteristics, the Court does credit his military

service for which he served honorably and for which he's
received a number of commendations.  Aside from a misdemeanor
indecent exposure conviction over 20 years ago, in 2001,
Mr. Creek has no other criminal record.  A large number of
friends, family, and colleagues have submitted character letters
on behalf of Mr. Creek, and I want to thank each one of those
individuals.  I read all of the letters, and they reveal that
Mr. Creek is deeply committed to his family, to his wife and his
three children, as well as to his entire community.  It's clear
he's a very helpful neighbor, and he's engaged in a wide range
of activities in his community.

He is also gainfully employed.  He runs a roofing business
that is very well respected; he is professionally, though the
business has taken a hit in light of this case unfortunately.

I do -- I want to credit Mr. Creek for entering an early
plea despite his -- the speed at which he showed remorse in this
case, which did take some time, but I do agree he is entitled to
an early plea and getting full credit for acceptance of
responsibility.  He saved the government and the Court time and
resources by accepting responsibility when he did.

Yet, it is concerning in terms of the need for specific
deterrence that it did take Mr. Creek a while to express full
remorse for his conduct.  There's little question that he
understood that day and that he understood immediately after
that day that his conduct was wrong and unlawful.  Yet, when he

was asked by the FBI some months later whether he regretted his actions that day, he said 50/50.  He regretted, I guess, having talked to the FBI, and he complained about having to go through extra screening at the airport.  But at least at that time, it's undisputed he did not express remorse about what he did to the Capitol police officers.  There's some question about what he stated specifically in that interview, but it's undisputed that he thought one of his friends with whom he had a falling out was trying to get him in trouble by telling the police he had assaulted police.  And I find those post-offense statements not credible.

As I've said, however, I do believe Mr. Creek's statements today are genuine, and he's truly remorseful.  He's truly sorry of what he did to the officers, their families, and his own family.

And Mr. Creek, no matter what your political views are and no matter what you thought about the 2020 presidential election that day, you know, as you've stated and admitted here today, you know that your actions that day were inconsistent with the oath you took as a Marine, inconsistent with those values.  And as a Marine, you defended the ideals of democracy, and you know that in our country elections are governed by the rule of law.  Assaults against the police officers who honorably defended our Capitol building that day are inconsistent with all of those values.  And the officers who fought so courageously to hold the

line were deeply impacted by the violence of January 6,
emotionally as well as physically, as were the elected officials
and their staff who hid inside the Capitol that day and were
traumatized by what they knew was happening outside the
building, as were the citizens of this country who watched the
violence that day and afterwards.

The unsuccessful attempt of the January 6 rioters to
interfere with the peaceful transfer of power in this country
has caused great harm to our democracy, and the actions you took
that day stand in stark contrast to your honorable service to
our country as a Marine.

Turning to the guidelines, as we've discussed, the correct
guideline range in this case is 24 to 30 months in prison.  The
government has recommended that the Court sentence Mr. Creek to
27 months, the mid-range of the guidelines.  Probation has
recommended that the Court sentence him to six months in prison,
but as noted, Probation incorrectly applied Section 2A2.4 rather
than Section 2A2.2 of the guidelines, and therefore, the Court
will not follow that recommendation.  The defense seeks a
sentence of probation with community service.

But considering similar cases in this district, aside from
the Leffingwell case, which we've discussed, and I believe it's
distinguishable from this one, the sentences in other cases
involving assault of law enforcement agents on January 6 -- and
these are cases prosecuted under 111(b), as well as 111(a),

which is the provision at issue here -- in all of those cases, the sentences imposed by other judges on this court have ranged from 41 to 63 months, and these include Judge Lamberth, as well as Judge Bates and Judge Chutkan.  Amy Berman Jackson imposed a much lower sentence in Leffingwell for the reasons we discussed earlier that, in my view, don't apply here.

As I've noted, Mr. Creek's guideline range of 24 to 30 months is substantially lower than these other assault cases, and that is principally because either he wasn't charged with 1512(c)(2) and/or he was not charged with using a dangerous weapon because, obviously, the government can't prove that, and he wasn't charged with causing bodily injury, again because the government can't prove that either.

I do recognize that Mr. Creek's actions on January 6 were very much out of character.  As his father stated, in the past, he has demonstrated respect for law enforcement officers.  His father was one.  I know he does respect them.

But the seriousness of his conduct on January 6 calls for a sentence of imprisonment to punish and to deter not only Mr. Creek but other potential future rioters.  And though I do credit that Mr. Creek took steps, he says, to help aid others that day, including a police officer, I do believe a sentence within the guideline range is justified, given the multiple assaults he committed on police officers and the grave context in which those assaults occurred and the fact that Mr. Creek

took a long time before acknowledging full responsibility for
his actions.

In light of those factors, as well as the sentences imposed
in similar cases in this district, I will sentence you,
Mr. Creek, to the -- I will follow the government's
recommendation and sentence you to the mid-range of the
guidelines, which is 27 months in prison.  I find this sentence
is sufficient and not greater than necessary to satisfy the
goals of sentencing and the various factors set forth in Section
3553.

Given the aggravating circumstances of this offense, let me
add that I would have imposed the same sentence had I sentenced
Mr. Creek under another assault guideline such as 2A2.3 or 2.4.

These are the reasons for the sentence.  I will now read
the formal sentence of the Court.  But before I impose sentence,
I will give both sides an opportunity to object.

Pursuant to the Sentencing Reform Act of 1984 and in
consideration of the provisions of Title 18 United States Code
Section 3553, as well as the advisory sentencing guidelines, it
is the judgment of the Court that you, Kevin Douglas Creek, are
hereby committed to the custody of the Bureau of Prisons for a
term of 27 months on Count 1.  You are further sentenced to
serve a 12 months' term of supervised release as to Count 1.  In
addition, you are ordered to pay a special assessment of $100.

While on supervision, you shall abide by the following

1   mandatory conditions, as well as the standard conditions of

2   supervision which are imposed to establish the basic

3   expectations for your conduct while on supervision:

4   　　　You must not commit another federal, state, or local crime.

5   You must not unlawfully possess a controlled substance.   You

6   must refrain from any unlawful use of a controlled substance.

7   　　　You must cooperate in the collection of DNA.

8   　　　You must make restitution in accordance with the statutory

9   provisions and the terms of your plea agreement.   You are

10  ordered to make restitution to the Architect of the Capitol

11  consistent with the plea agreement in the amount of $2,000.

12  　　　The Court finds you don't have the ability to pay a fine

13  and, therefore, waives imposition of a fine in this case and

14  also waives any interest or penalties that may accrue on the

15  balance of the restitution.

16  　　　Restitution payments shall be made to the Clerk of Court.

17  　　　Within 45 days of release from prison, you will appear

18  before the Court for a re-entry progress hearing.   I will order

19  that your supervision will be -- at that time you will be

20  supervised by the District in Georgia, but I will retain

21  jurisdiction over this case, and I will ask that the Probation

22  Office in the district in which you're supervised to submit a

23  progress report to the Court within 30 days of release.   Once I

24  review that progress report, I will determine whether your

25  appearance is required for a re-entry hearing.

1      Pursuant to -- first, let me ask, before I impose sentence,

2   is there any objection, Ms. Fifield, to the sentence that I've

3   just announced?

4            MS. FIFIELD:  No objection from the government.

5            THE COURT:  Mr. Jones, any objection?

6            MR. JONES:  No, Your Honor.

7        Your Honor, can you address the voluntary surrender?

8            THE COURT:  I will get there.  I just want to make

9   sure, you have no objections to the sentence that I've

10   announced?

11            MR. JONES:  No, Your Honor.

12            THE COURT:  All right.  I will now order that the

13   sentence I just -- Probation, before I proceed, does Probation

14   have any concerns with the sentence I've announced?

15            PROBATION OFFICER:  No objection, Your Honor, but a

16   clarification.  We did confirm from Pretrial records that the

17   defendant was released from custody three days after he was

18   ordered to be released, which was June the 24th.  So June the

19   24th is his release date.

20            THE COURT:  All right.  So you will make that change

21   to the PSR so he gets full credit?

22            PROBATION OFFICER:  Yes, Your Honor.

23            THE COURT:  Thank you.  Any other concerns,

24   Ms. Willett, with the sentence or the conditions I've stated?

25            PROBATION OFFICER:  No, Your Honor.

1          THE COURT:  All right.  Mr. Creek, pursuant to Title

2   18 United States Code Section 3742, you do have a right to

3   appeal the sentence imposed by this Court if the period of

4   imprisonment is longer than the statutory maximum or the

5   sentence departs upward from the applicable guideline range.  If

6   you choose to file an appeal, you must file any appeal within 14

7   days after the Court enters judgment.

8          You also have the right to challenge the conviction entered

9   or the sentence imposed if new or currently unavailable

10  information becomes available or on a claim that you've received

11  ineffective assistance of counsel in entering a plea of guilty

12  or in connection with this sentencing.

13         If you're unable to afford the cost of appeal, you may

14  request permission from the Court to file an appeal without cost

15  to you.

16         Is there a government motion with respect to -- are there

17  remaining counts here, Ms. Fifield?

18         MS. FIFIELD:  Your Honor, there's only the superseding

19  information.  I believe there's nothing to dismiss.

20         THE COURT:  Well, to the extent there is, the Court

21  will dismiss it.

22         And with regard to release, does the government object to

23  Mr. Creek voluntarily surrendering?  He's been compliant with

24  his conditions of release.

25         MS. FIFIELD:  No objection to the voluntary surrender.

1          THE COURT:  All right.  So Mr. Jones, in terms of the

2     voluntary surrender date, I know that you've said that Mr. Creek

3     has medical procedures that are expected.  Is there a date by

4     which -- typically, I would ask you to have Mr. Creek

5     voluntarily surrender when the probation officer notifies him of

6     the date and location, but are you asking for a certain amount

7     of time so that he can have surgery?

8          MR. JONES:  Yes, Your Honor.  I'm getting a date, Your

9     Honor.

10          THE DEFENDANT:  I have to do certain things with my

11     insurance to get approved for the surgery.  It's a process.

12          MR. JONES:  Your Honor, can we have Mr. Creek

13     self-surrender at the end of June?

14          THE COURT:  Sure.  How about this:  I will -- I'm

15     sorry.  I think I called Mr. Creek Mr. Jones.  I apologize for

16     that.

17        He can self-surrender at a date that he's directed by

18     Probation.  Ms. Willett, can I say that that date can be no

19     earlier than July 1st?  Will that work for Probation, from

20     Probation's standpoint?

21          PROBATION OFFICER:  Your Honor, I think generally they

22     say on or after.  So like on or after June 30th or whatever date

23     you choose.

24          THE COURT:  All right.  So I will say -- sorry,

25     Mr. Jones?

1          MR. JONES:  I apologize, Your Honor.  Your Honor,

2     could we also make a recommendation for a facility closest to

3     Atlanta?

4          THE COURT:  Of course, yes.

5          MR. JONES:  Maybe Montgomery.

6          THE COURT:  Is there a specific facility or just one

7     close to --

8          MR. JONES:  If he qualifies, Your Honor, could he go

9     to Montgomery, Alabama?  That's FTC.

10         THE COURT:  I will make that recommendation, but it's

11    simply a recommendation.

12         MR. JONES:  Yes, Your Honor.

13         THE COURT:  I will say a facility close to his home,

14    and that ultimately will be up to the BOP.

15         MR. JONES:  Yes, Your Honor.

16         COURTROOM DEPUTY:  Your Honor, what was the language

17    you were about to use for the self-surrender?

18         THE COURT:  So he shall self-surrender at a date and

19    time to be provided by Probation on or after July 1 of 2020.

20       All right.  Is there anything else about the mechanics of

21    the sentence that we need to address for either side?

22    Ms. Fifield?

23         MS. FIFIELD:  Just a couple of clarifications.  I

24    misspoke just now and referred to the information as

25    superseding.  It's just the information.

1    And I believe in terms of the date of which Mr. Creek

2    self-surrenders, you said on or after July 1st, 2020.  I just

3    wanted to clarify.

4            THE COURT:  Oh, yes, 2022.

5            MS. FIFIELD:  Thank you.

6            COURTROOM DEPUTY:  One last thing, Your Honor.  I just

7    want to make sure.  Supervision is being given over to the

8    Southern District of Georgia?

9            THE COURT:  I think it's the Northern District.  Isn't

10   it, Ms. Willett?

11           PROBATION OFFICER:  I believe so, Your Honor, but

12   that's something that we can facilitate once --

13           THE COURT:  I don't think you need to address that

14   now, Mr. Hopkins.

15           COURTROOM DEPUTY:  Okay.

16           PROBATION OFFICER:  We would also like to clarify with

17   Mr. Creek that he is still obligated to his pretrial bond

18   conditions while he's awaiting the self-surrender process and

19   that he will be provided information by e-mail from our office

20   that gives him notification on what his requirements are pending

21   that process.

22           THE COURT:  All right.  Yes.

23      Mr. Creek, do you understand that?  You're still to abide

24   by the conditions of release that were set?

25           THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  All right.  Mr. Creek, this is a very

2     difficult case.  You showed very poor judgment on January 6, and

3     I also know from all of the letters that I've received from your

4     friends and family that you have some sterling qualities and

5     that you really have contributed in many admirable ways to your

6     community, as well as to your family.

7          And I hope that you feel you've been treated fairly in this

8     process, and I trust that you understand that you've been

9     sentenced today for your actions and not for your political

10    views.

11         I also hope that when you're released from prison you will

12    come out ready to positively influence those who may find

13    themselves tempted to engage in similar acts of violence rather

14    than engage in our political system in an unlawful way.  You've

15    been a leader as a Marine.  You've been a leader in your

16    community in many ways.  This presents another opportunity for

17    you to serve your country and its democratic ideals.  You would

18    do a great service to your country if you would show leadership

19    in this way upon your release from prison.  So I hope you will

20    sincerely take that path, and I do wish you and your family all

21    the best.

22         Anything else from either side?

23              MS. FIFIELD:  Nothing further from the government.

24              MR. JONES:  No, Your Honor.  Thank you very much.

25              THE COURT:  All right.  Thank you, all.

1    (Proceedings adjourned at 12:17 p.m.)

2

3    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

4

5                CERTIFICATE OF OFFICIAL COURT REPORTER

6

7         I, Sara A. Wick, certify that the foregoing is a

8    correct transcript from the record of proceedings in the

9    above-entitled matter.

10

11        Please Note:  This hearing occurred during the

12   COVID-19 pandemic and is, therefore, subject to the

13   technological limitations of court reporting remotely.

14

15

16   /s/ Sara A. Wick                June 13, 2022

17   SIGNATURE OF COURT REPORTER          DATE

18

19

20

21

22

23

24

25